# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE USG CORPORATION       ) CONSOLIDATED
STOCKHOLDER LITIGATION    ) C.A. No. 2018-0602-SG

## MEMORANDUM OPINION

Date Submitted: June 22, 2020
Date Decided: August 31, 2020

Blake A. Bennett, of COOCH & TAYLOR, P.A., Wilmington, Delaware; OF COUNSEL: Michael J. Palestina, of KAHN SWICK & FOTI, LLC, New Orleans, Louisiana; Juan E. Monteverde and Miles D. Schreiner, of MONTEVERDE & ASSOCIATES, New York, New York, *Attorneys for Plaintiffs*.

Raymond J. Dicamillo, Srinivas M. Raju, Robert L. Burns, Matthew D. Perri, and Angela Lam, of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; OF COUNSEL: Robert S. Faxon, Andrienne F. Mueller, and Robert E. Johnson, of JONES DAY, Cleveland, Ohio, *Attorneys for Defendants*.

GLASSCOCK, Vice Chancellor

This matter involves the acquisition (the "Acquisition") of USG Corporation ("USG")[1], a building materials company, by a strategic buyer, Gebr. Knauf KG. The Plaintiffs, former USG stockholders, allege that USG's directors—party Defendants—breached fiduciary duties in connection with USG's sale to Knauf.[2] They seek monetary damages.

USG's stockholders overwhelmingly approved the sale. The Defendants have moved to dismiss; first, they seek a dismissal under the rubric of *Corwin v. KKR Financial Holdings, LLC*.[3] That case stands for the proposition that where the stockholder-owners of a corporation are given an opportunity to approve a transaction, are fully informed of the facts material to the transaction, and where the transaction is not coercive, there is no agency problem for a court to review, and litigation challenging the transaction is subject to dismissal under the business judgment rule. The Defendants' Motion in reliance on *Corwin* is rather easy to deal with, as the Plaintiffs' Verified Amended Complaint (the "Amended Complaint") specifically pleads facts, which I must assume at this pleading stage are true, that make it reasonably conceivable that USG's stockholders were not fully informed at the time they approved the Acquisition. The Plaintiffs allege that USG's Board of

---

[1] USG makes a popular product so dominant in its field that it risks becoming a common noun: the famous "Sheetrock" wallboard.

[2] Knauf, as defined below, includes Gebr. Knauf KG, together with affiliated entities and individuals.

[3] 125 A.3d 304 (Del. 2015).

Directors (the "Board") had reached a subjective belief that USG had an intrinsic value nearly 15% higher than the deal price, yet the directors failed to disclose this fact to USG's stockholders. Breaches of duty inherent in the Acquisition, therefore, cannot be deemed cleansed under the *Corwin* rationale.

This raises the question of what bearing the determination described above has on the balance of the Defendants' Motion to Dismiss, which alleges that the Plaintiffs have failed to state a claim upon which relief can be granted against the Defendants. Due to an exculpation clause in USG's charter, the Plaintiffs will be required to demonstrate a breach of the duty of loyalty, or its doppelganger bad faith, to recover damages.[4] It became clear in briefing and at Oral Argument that the Plaintiffs make two assumptions that I find unwarranted. The first is that, having pled facts that raise a reasonable inference of disclosure deficiencies sufficient to scuttle the *Corwin* defense, they have necessarily cleared the bar of pleading bad faith on the part of the Defendant directors for purpose of withstanding a dismissal under Rule 12(b)(6). Doctrinally, however, the concept of bad faith, and the determination of adequate disclosure for *Corwin* purposes, are fundamentally separate. They involve different inquiries, the outcomes of which are not necessarily mutually supportive.

---

[4] *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1179–80 (Del. 2015).

A series of hypotheticals may help illustrate the distinction. First, consider an allegation, for example, that directors omitted from a proxy statement the fact that they had received a kickback from the buyer, in return for which they cut short a sales process. Such an allegation, if adequately pled, would easily support a rejection of *Corwin* cleansing *and* a pleading of breach of loyalty. But the focus of the two inquires would be different. For *Corwin* purposes, the focus would be on what the stockholders were told; the 12(b)(6) analysis would focus on the director's allegedly faithless actions. By counterexample, this hypothetical bribe, if fully disclosed to the stockholders in way of a non-coercive vote, and in the (unlikely) scenario that the stockholders nonetheless approved the transaction, theoretically would result in dismissal under *Corwin* despite adequate pleading of a clear breach of loyalty on the part of the directors.[5]

Conversely, posit a situation where the defendant directors have approved and submitted a merger in which the stockholders will receive $9.50/share. They authorize a proxy statement that discloses, truthfully and completely, that their financial advisor has opined that a range of fair value for the company is $9.00–$9.99 per share. Now assume that, via a printer's error, half the proxies issued erroneously give the fairness range as $6.00–$6.66 per share. The stockholders approve the sale, half of them in theoretical reliance on the erroneous fairness range.

---

[5] I concede that likelihood that any vote in such a scenario would be coercive.

Clearly, the error would be material and would render *Corwin* inapplicable. Such a finding by the court would have no bearing, however, on whether the complaint otherwise adequately pled bad faith or breach of the duty of loyalty against the directors sufficient to withstand a motion under Rule 12(b)(6).

In my view, civil litigation in general can be seen as akin to a steeplechase, where the plaintiff must clear a series of obstacles: first, sufficient pleading to state a claim and withstand a motion to dismiss under 12(b)(6); next, perhaps, amassing a record sufficient to carry across a motion for summary judgment, and finally proof by a preponderance of the evidence at trial. After having cleared such hurdles the plaintiff would be entitled to a remedy. But fiduciary duty litigation in the corporate arena, of the type before me here, is designed to address problems of agency, and where fiduciaries can eliminate agency problems by satisfying *Corwin*, they may seek dismissal on that ground. Then, the course is never run: the starting tape never drops to allow the steeplechase to begin. Where a court determines that *Corwin* does not apply, conversely, the race is on; the starter calls, the tape falls away, and the litigants are off—to run the same course that lies in front of them just as they would had the defendants never sought to dismiss under *Corwin*.

Viewed in that light, and having determined that *Corwin* does not cleanse the transaction here, I must turn to the allegations of the Amended Complaint to see whether a claim has been pled upon which I may grant relief.

4

The Plaintiffs' second assumption—erroneous, in my view—is that they must simply plead claims that are reasonably conceivable as a breach of duty under *Revlon*[6] and its progeny to withstand a motion to dismiss. That is, according to the Plaintiffs, they have stated a claim by merely alleging facts that make it reasonably conceivable that the Defendant directors did not act reasonably with regard to achieving maximum value for USG's stockholders via the Acquisition. In this post-closing damages action, however, the Defendants are exculpated from liability for damages by a provision in USG's charter, absent breach of the duty of loyalty or bad faith. Therefore, to plead a claim sufficient to withstand the Defendants' Motion to Dismiss, the Plaintiffs must plead facts that make it reasonably conceivable that the Defendants have acted with the requisite culpability. I find that the disclosure deficiency alleged, although it prevents the application of *Corwin*, is insufficient to reasonably imply bad faith, and that the other facts alleged likewise fail to state a claim of breach of the duty of loyalty or reasonably imply actions taken in bad faith. Accordingly, the Defendants' Motion to Dismiss is granted. The facts, together with a more detailed statement of my rationale, are laid out, below.

---

[6] *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986).

# I. BACKGROUND[7]

## A. The Parties and Relevant Non-Parties

Non-party USG was a Delaware corporation headquartered in Chicago, Illinois.[8] USG was a manufacturer and distributor of building materials, and is best known as the manufacturer and seller of Sheetrock brand drywall and wall products.[9] At the time of the Acquisition, USG was the largest distributor of wallboard in the United States and the largest manufacturer of gypsum products in North America.[10]

Defendant Steven F. Leer was a director of USG from July 2005 through the close of the Acquisition, and was Chairman of the Board at all relevant times.[11]

Defendant Jennifer F. Scanlon was USG's Chief Executive Officer and President from November 2016 through the close of the Acquisition, and was a director of USG from September 2016 through the close of the Acquisition.[12]

Defendant Jose Armario was a director of USG from January 2007 through the close of the Acquisition.[13] Armario was not re-elected to the Board at USG's

---

[7] The facts, except where otherwise noted, are drawn from the Plaintiffs' Verified Amended Class Action Complaint, D.I. 78 (the "Amended Complaint" or "Am. Compl."), and are presumed true for the purposes of evaluating the Defendants' Motion to Dismiss.

[8] Am. Compl., ¶ 21.

[9] *Id.* ¶ 2.

[10] *Id.*

[11] *Id.* ¶ 11.

[12] *Id.* ¶ 12.

[13] *Id.* ¶ 13.

2018 annual stockholder meeting, but continued to serve as a holdover director at all relevant times.[14]

Defendant William H. Hernandez was a director of USG from September 2009 through the close of the Acquisition.[15] Hernandez was not re-elected to the Board at USG's 2018 annual stockholder meeting, but continued to serve as a holdover director at all relevant times.[16]

Defendant Richard P. Lavin was a director of USG from November 2009 through the close of the Acquisition.[17]

Defendant Brian A. Kenney was a director of USG from February 2011 through the close of the Acquisition.[18]

Defendant Gretchen R. Haggerty was a director of USG from May 2011 through the close of the Acquisition.[19] Haggerty was not re-elected to the Board at USG's 2018 annual stockholder meeting, but continued to serve as a holdover director at all relevant times.[20]

Defendant Matthew Carter, Jr. was a director of USG from September 2012 through the close of the Acquisition.[21]

---

[14] *Id.*
[15] *Id.* ¶ 14.
[16] *Id.*
[17] *Id.* ¶ 15.
[18] *Id.* ¶ 16.
[19] *Id.* ¶ 17.
[20] *Id.*
[21] *Id.* ¶ 18.

Defendant Thomas A. Burke was a director of USG from September 2013 through the close of the Acquisition.[22]

Non-party Gebr. Knauf KG ("Gebr. Knauf") is a limited partnership organized under the laws of the Federal Republic of Germany.[23] Gebr. Knauf is owned and controlled by members of the Knauf family.[24] C&G Verwaltungs GmbH ("C&G") is a limited liability company organized under the laws of the Federal Republic of Germany and is an indirect subsidiary of Gebr. Knauf.[25] World Cup Acquisition Corporation ("Merger Sub") is a Delaware corporation and wholly owned subsidiary of Gebr. Knauf.[26] Gebr. Knauf together with its various affiliated individuals and entities including Alexander Knauf ("Mr. Knauf"), Manfred Grundke, C&G, and Merger Sub, are collectively referred to herein as "Knauf."[27]

Knauf is a German manufacturer of building materials.[28] Knauf beneficially owned approximately 10.6% of USG's outstanding common stock at the time of the execution of the agreement and plan of merger between USG, Gebr. Knauf, and Merger Sub (the "Merger Agreement").[29]

---

[22] *Id.* ¶ 19.
[23] *Id.* ¶ 22.
[24] *Id.*
[25] *Id.* ¶ 23.
[26] *Id.* ¶ 24.
[27] *Id.* ¶ 25. I refer to all individuals in this Memorandum Opinion by only their last name other than Alexander Knauf, who I refer to as Mr. Knauf. I use the honorific only to distinguish Mr. Knauf from the Knauf entities.
[28] *Id.* ¶ 3.
[29] *Id.* ¶ 25.

Berkshire Hathaway Inc. is a Delaware corporation headquartered in Omaha, Nebraska.[30] Berkshire Hathaway Inc. is a holding company that owns subsidiaries engaged in various business activities including insurance, freight, rail transportation, utilities, and consumer goods.[31] The famed investor Warren Buffett is Berkshire Hathaway Inc.'s Chairman and controller.[32] Berkshire Hathaway Inc. together with its various affiliated entities is collectively referred to herein as "Berkshire Hathaway" or "Berkshire."[33] At the time of the execution of the Merger Agreement Berkshire Hathaway beneficially owned approximately 31.1% of USG's outstanding common stock.[34]

Plaintiffs Kevin D. Anderson and Susan Fitzgerald are, and at all times pertinent were, stockholders of USG.[35]

*B. Knauf and Berkshire Hathaway Amass Stakes in USG*

Knauf initially acquired USG stock in October 2000 when Knauf International GmbH purchased approximately 4.3 million shares of USG common stock on the

---

[30] *Id.* ¶ 26.
[31] *Id.* ¶ 47.
[32] *Id.*
[33] Berkshire Hathaway Inc.'s affiliated entities include, but are not limited to: Berkshire Hathaway Life Insurance Company of Nebraska, a Nebraska corporation; Berkshire Hathaway Assurance Corporation, a New York corporation; National Indemnity Company, a Nebraska corporation; General Re Life Corporation, a Connecticut corporation; General Reinsurance Corporation, a Delaware corporation; and General Re Corporation, a Delaware corporation. *Id.* ¶¶ 27–32.
[34] *Id.* ¶ 33.
[35] *Id.* ¶ 10. I assume by this pleading the Plaintiffs intend to convey that they were stockholders of USG until the Acquisition closed.

open market.[36]   Subsequently, Knauf representatives regularly met with USG's senior management to discuss Knauf's ownership in USG and opportunities for transactions between USG and Knauf.[37]   In 2001, USG and Knauf formed a joint venture to manufacture and distribute concrete panels throughout Europe and the former Soviet Union.[38]   Knauf began purchasing more USG shares on the open market in 2007, and by January 8, 2008 had amassed a stake of 14.5% of USG's outstanding common stock.[39]   USG explored an equity offering in 2008, and Knauf approached USG about expanding its equity stake in USG with a path to acquiring a controlling interest and/or eventual full ownership of USG, but Knauf ultimately declined to participate in the equity offering.[40]   In 2012, Knauf acquired USG's European ceilings and surfaces business for approximately $80 million, and in December 2015, Knauf acquired USG's interest in USG and Knauf's aforementioned European joint venture for approximately €48 million in cash.[41] Knauf explored additional possibilities of commercial cooperation between itself and USG, although they did not ultimately come to fruition.[42]

---

[36] *Id.* ¶ 44.
[37] *Id.*
[38] *Id.*
[39] *Id.*
[40] *Id.* ¶ 45.
[41] *Id.* ¶ 46.
[42] *Id.*

Berkshire Hathaway first acquired an interest in USG in November 2000 by purchasing 6.5 million shares on the open market.[43] In January 2006, during the pendency of USG's Chapter 11 reorganization, Berkshire Hathaway provided a backstop commitment to purchase up to 45 million shares of USG as part of a rights offering transaction that formed part of the funding for USG's then-proposed Chapter 11 plan of reorganization and bankruptcy exit.[44] Berkshire Hathaway committed to a maximum aggregate purchase price of $1.8 billion in connection with the rights offering, and was paid a non-refundable commitment fee of $100 million by USG.[45]

Berkshire Hathaway acquired beneficial ownership of an additional 6,969,274 shares of USG common stock pursuant to the rights offering transaction.[46] Berkshire Hathaway immediately began purchasing more shares of USG on the open market and by October 4, 2006, Berkshire Hathaway had increased its stake in USG to 17,072,192 shares, equivalent to 19% of USG's outstanding common stock.[47]

In November of 2008, Berkshire Hathaway purchased an aggregate of $300 million of 10% Contingent Convertible Senior Notes due 2018 (the "Notes"), which became convertible into USG common stock at any time prior to the Notes' final

---

[43] *Id.* ¶ 48.
[44] *Id.* ¶ 50.
[45] *Id.*
[46] *Id.* ¶ 52.
[47] *Id.*

maturity (unless repurchased or redeemed by USG).[48]  By April 11, 2014, Berkshire Hathaway had converted all of the Notes into common stock—pursuant to such conversion Berkshire Hathaway beneficially owned an aggregate of 43,387,980 shares of USG, amounting to 30.4% of USG's outstanding common stock.[49]

*C. Knauf Approaches USG and Berkshire Hathaway Regarding an Acquisition; Knauf and Berkshire Hathaway's Initial Discussions; Knauf Makes a Formal Offer to USG*

Knauf had long cited USG as a potential acquisition target that would allow Knauf to secure a significant beachhead in the North American market.[50]  At a January 25, 2017 meeting between Knauf's principals (Mr. Knauf and Grundke) and certain members of USG's management (including Defendant Scanlon, USG's CEO), Knauf indicated that it was looking for ways to partner with USG.[51]  On February 8, 2017, Scanlon updated USG's Board regarding the January 25 meeting, and noted that following Knauf's then-recent acquisition of a wallboard plant in Mexico, Knauf was potentially considering entering the U.S. wallboard market (wallboard being USG's primary business).[52]  The next day, the Board indicated to Knauf that USG would not be in a position to respond to its inquiry until the completion of a strategic review process expected to be completed in mid-2017.[53]

---

[48] *Id.* ¶¶ 53–54.
[49] *Id.* ¶ 55.
[50] *Id.* ¶ 61.
[51] *Id.* ¶ 62.
[52] *Id.* ¶ 63.
[53] *Id.* ¶ 64.

In March 2017, Knauf (through its financial advisor Morgan Stanley Bank AG ("Morgan Stanley")) reached out to Berkshire Hathaway regarding Knauf's plans and the sides discussed such plans throughout the month.[54] By mid-May 2017 it was clear to Knauf that Berkshire Hathaway was ready to sell its stake in USG and that it would do so at or near $40 per share.[55] Indeed, at Berkshire Hathaway Inc.'s May 6, 2017 annual stockholder meeting, Warren Buffett noted that Berkshire Hathaway's USG investment was "disappointing," not a "brilliant investment," and "not one of my great ideas."[56] Knowing it would have Berkshire Hathaway's support for an acquisition that valued USG at over $40 per share, Knauf began to consider how to structure such a transaction.[57] Knauf sought to avoid executing a formal agreement with Berkshire Hathaway in the short term to avoid disclosure obligations under U.S. securities laws.[58] Knauf and Berkshire Hathaway continued to negotiate and began communicating directly (rather than through Morgan Stanley) in July of 2017.[59]

On September 19, 2017, USG informed Knauf that based on its strategic review USG did not see value in a combination.[60] On October 4, 2017, Morgan

---

[54] *Id.* ¶ 65.
[55] *Id.* ¶ 66.
[56] *Id.* ¶ 67.
[57] *Id.* ¶ 68.
[58] *Id.*
[59] *Id.* ¶ 69.
[60] *Id.* ¶ 70.

Stanley delivered a Knauf-USG Acquisition Analysis Presentation to Berkshire Hathaway that assumed a purchase price of $40 per USG share.[61] On October 18, 2017, Knauf (represented by Mr. Knauf and Grundke) and Berkshire Hathaway (represented by Buffett and his first lieutenant Combs) met in Omaha, Nebraska to discuss USG, and at the meeting agreed to a price of $40 per share.[62]

On November 29, 2017, Knauf met with Scanlon—along with USG's Chief Financial Officer and General Counsel—and informed USG of Knauf's intention to make a proposal to acquire USG in an all-cash transaction.[63] At the meeting Knauf delivered to USG an indicative and non-binding proposal to acquire USG for $40.10 per share in cash—the offer stated that it was not to be disclosed except to the Board, USG's advisors, and Berkshire Hathaway.[64] USG's Board met on December 15, 2017 and discussed the possibility of a hostile tender offer by Knauf or others, and discussed Knauf's business and the relationship between USG and Knauf generally.[65] Berkshire Hathaway's interest in USG was also discussed, including Berkshire Hathaway's previously stated desire for an exit from its USG investment.[66] The Board recognized that Berkshire Hathaway was practically unable

---

[61] *Id.* ¶ 72.
[62] *Id.* ¶ 74.
[63] *Id.* ¶ 79.
[64] *Id.*
[65] *Id.* ¶ 83.
[66] *Id.* ¶ 84.

to exit its USG investment at the market price given its large position.[67] The Board decided to contact Berkshire Hathaway prior to responding to Knauf's offer to inquire about Berkshire Hathaway's interactions with Knauf.[68]

Informed by its own determination of USG's intrinsic value, the Board determined at the meeting that Knauf's offer was "inadequate and insufficient."[69] At the meeting management noted that USG was experiencing positive momentum in the fourth quarter of 2017 and specifically expressed confidence in management's long term plan for USG.[70] The Board also received a detailed review of valuation analyses conducted by its financial advisors.[71]

On December 19, 2017, Scanlon and USG's General Counsel held a call with Buffett where Buffett acknowledged that Berkshire Hathaway had communicated with Knauf's financial advisors as of that morning—Buffett did not disclose the parties' previous discussions.[72] Buffett also remarked that he would not take independent action.[73] Scanlon stated that the Board had determined that Knauf's offer was "not in the range of [USG's] intrinsic value"—Buffett communicated his support for an all-cash acquisition and encouraged Scanlon to engage with Knauf.[74]

---

[67] *Id.* ¶ 85.
[68] *Id.*
[69] *Id.* ¶ 86.
[70] *Id.* ¶ 83.
[71] *Id.*
[72] *Id.* ¶ 87.
[73] *Id.*
[74] *Id.*

On December 20, 2017, USG formally notified Knauf that the Board had determined Knauf's offer was "wholly inadequate given [USG's] intrinsic value and therefore it was not in the best interests of [USG's] stockholders."[75] Berkshire Hathaway indicated to Knauf that it viewed the Board's rejection as "absolutely disgusting," that Berkshire Hathaway was "willing to vote against the directors," and that Berkshire Hathaway would share its opinion publicly should the offer become public.[76]

### D. Knauf Makes a Second Offer; Knauf's Overtures Become Public

Knauf and Berkshire Hathaway continued to engage in discussions regarding an acquisition of USG in late 2017 and early 2018—Berkshire Hathaway made clear that it would vote against the Board though it was not yet willing to say so publicly.[77] On February 8, 2018, Knauf contacted Leer, USG's Chairman, and demanded a meeting to "establish a relationship" with Leer.[78] On March 8, 2018, USG held its inaugural "Investor Day" presentation, the primary purpose of which was to "help investors and analysts understand the long-term value proposition of [USG]"—at the Investor Day USG disclosed certain financial projections through the end of USG's 2020 fiscal year.[79]

---

[75] *Id.* ¶ 89.
[76] *Id.* ¶ 91.
[77] *Id.* ¶ 93.
[78] *Id.* ¶ 94.
[79] *Id.* ¶ 96.

On March 12, 2018, Mr. Knauf and Grundke met with Leer and Scanlon and reiterated Knauf's "determination" to acquire USG, indicated that a revised proposal would be forthcoming, and threatened that it would approach USG's stockholders directly if the Board would not "play ball."[80] Three days later Knauf delivered to USG a revised takeover proposal for $42.00 per share.[81] The proposal stated: "Should you choose not to engage in good faith discussions with us we may reconsider our behavior."[82] USG and Berkshire Hathaway thereafter discussed Knauf's revised proposal.[83]

On March 23, 2018, the Board met to discuss Knauf's revised proposal.[84] At the meeting one of USG's financial advisors noted the "possibility of a change of behavior" by Knauf, and that USG's 52-week high stock price and the median and highest analyst stock prices had all increased.[85] The financial advisors also informed the Board that USG's discounted cash flow ("DCF") valuation had increased since December 2017, and that Knauf's revised proposal was at the low end of their DCF value ranges and below the average for various premium analysis metrics.[86] The Board discussed its thoughts regarding USG's "intrinsic value."[87] The Board also

---

[80] *Id.* ¶ 97.
[81] *Id.* ¶ 98.
[82] *Id.*
[83] *Id.* ¶ 99.
[84] *Id.* ¶ 100.
[85] *Id.*
[86] *Id.*
[87] *Id.*

discussed Berkshire Hathaway and specifically recognized that "they could not substitute the judgment of one shareholder for what they believed to be in the best interest of all shareholders, particularly given the different posture of that one shareholder."[88] The Board further discussed the possibility that Knauf would attempt to acquire USG for "less than its intrinsic value" and that Knauf may "attempt to push for a shareholder vote."[89] The Board unanimously determined that Knauf's revised proposal was "wholly inadequate."[90]

On that same day, Berkshire Hathaway and Knauf met, and at the meeting Berkshire Hathaway proposed to grant Knauf an option to purchase all of Berkshire Hathaway's USG stock for $42.00 per share.[91] On March 25, 2018, Berkshire Hathaway notified Morgan Stanley that it would publicly disclose the existence of Knauf's proposal, Knauf and Berkshire Hathaway's communications, and that Berkshire Hathaway had offered Knauf an option to buy Berkshire Hathaway's USG stock at $42.00 per share.[92] Knauf sought to persuade Berkshire Hathaway to not make the public disclosure, and also sought at a minimum to edit some of the text of the proposed disclosure.[93]

---

[88] *Id.* ¶ 101.
[89] *Id.* ¶ 102.
[90] *Id.*
[91] *Id.* ¶ 104.
[92] *Id.* ¶ 105.
[93] *Id.* ¶¶ 106–08.

On March 26, 2018, Berkshire Hathaway amended its Schedule 13D to disclose the March 23, 2018 conversation and option offer—Knauf likewise amended its own Schedule 13D to disclose the option offer and its revised proposal.[94] Neither filing substantively disclosed the coordination between Knauf and Berkshire Hathaway that had occurred in the previous year.[95]

Also on March 26, 2018, USG's Board formally rejected Knauf's revised proposal as "wholly inadequate"—the Board was "focused on the intrinsic value of our long-term strategic plan and measuring that against the proposal price."[96] On the same day, USG issued a press release that acknowledged its receipt of Knauf's proposal, disclosed that the Board has unanimously rejected the revised proposal, and stated that the $42.00 per share offer "substantially undervalues the Company and is not in the best interest of all of USG's shareholders," and that the revised proposal "does not reflect USG's intrinsic value."[97]

*E. Knauf Initiates the Withhold Campaign; Berkshire Hathaway Publicly Supports Knauf's Bid and Withhold Campaign*

After the public disclosures, Knauf took measures consistent with the commencement of hostile stockholder action, specifically an 8 *Del. C.* § 220 demand requesting a list of USG's stockholders in advance of USG's 2018 annual meeting

---

[94] *Id.* ¶ 111.
[95] *Id.*
[96] *Id.* ¶ 112.
[97] *Id.*

19

with a stated purpose of communication regarding the stockholders' mutual interests "including the solicitation of proxies for the election of directors in connection with the annual meeting."[98]

At an April 5, 2018 meeting between USG and Knauf's respective advisors, USG's advisors remarked that Knauf's offer was not within a range to support engaging in a diligence process and that it did not appear that Knauf would be willing to propose a price that would reflect the Board's intrinsic value of USG.[99] When asked about its intentions regarding the § 220 demand, Knauf stated that it "simply intended to preserve [its] options."[100] Knauf left the meeting with an understanding that an offer of $45.00 per share would guarantee it access to additional information.[101] On that same day, Buffett and Scanlon spoke in order to provide Buffett with a confidential update on the USG's engagement with Knauf to date— Buffett encouraged continued engagement with Knauf and communicated that he thought USG's stockholders would approve a transaction.[102] Buffett confirmed that Berkshire Hathaway was "engaging" with Knauf on Berkshire Hathaway's option offer.[103]

---

[98] *Id.* ¶ 115.
[99] *Id.* ¶ 116.
[100] *Id.*
[101] *Id.*
[102] *Id.* ¶ 117.
[103] *Id.*

An April 9, 2018 Knauf internal presentation remarked on Knauf's leverage over the Board considering Berkshire Hathaway's support, and Knauf determined not to pursue Berkshire Hathaway's option offer because it already had Berkshire Hathaway's public support at $42 per share "without having to pay for it upfront."[104] The next day USG indicated that Knauf's § 220 demand did not comply with the statute and asked for additional evidence that Knauf was a stockholder of USG.[105]

On April 10, 2018, Knauf issued a press release announcing its intention to solicit proxies from USG's stockholders against USG's four director nominees in connection with the 2018 annual meeting and filed its preliminary proxy materials in connection with Knauf's withhold campaign (the "Withhold Campaign").[106] Knauf's press release acknowledged that Knauf had Berkshire Hathaway's support for any offer over $42.00 per share and reserved the right to nominate one or more individuals for election as directors.[107] USG issued a reactionary press release wherein Leer stated that USG's offer was "wholly inadequate, opportunistic, and

---

[104] *Id.* ¶¶ 119–20.
[105] *Id.* ¶ 121.
[106] *Id.* ¶ 122. "In uncontested director elections—and the overwhelming majority of elections are uncontested—the only choice for shareholders who do not want to vote for a board nominee is to mark their proxy card (or voting instruction form) to withhold authority to vote for the director at issue." Marcel Kahan & Edward Rock, *The Insignificance of Proxy Access*, 97 Va. L. Rev. 1347, 1358 (2011).
[107] Am. Compl., ¶ 122.

does not reflect the intrinsic value of the company."[108]  Scanlon stated that Knauf "ha[d] not indicated any willingness to pay full value to all of our shareholders."[109]

On April 12, 2018, the Board issued a formal letter to USG's stockholders urging stockholders to vote for the election of USG's four director nominees at the 2018 annual meeting.[110]  The Board stated that Knauf's campaign was a "misguided attempt to pressure the Board into accepting a proposal from Knauf to purchase USG, that we believe is substantially below our intrinsic value," and that "[t]he Board is creating value for all our stockholders through the execution of our strategic plan[.]"[111]

On the same day, Berkshire Hathaway publicly communicated its intent to support Knauf and vote against the Board's nominees.[112]  Knauf stated that it was "pleased" that Berkshire Hathaway had indicated its support for the Withhold Campaign and reiterated that its offer "present[ed] and [sic] immediate, high-value and cash-certain monetization opportunity for all USG shareholders."[113]  The Plaintiffs note a "strong suggestion" that Berkshire Hathaway's and Knauf's public statements were coordinated.[114]  Morgan Stanley told Knauf that Buffett "pushed it

---

[108] *Id.* ¶ 123.
[109] *Id.*
[110] *Id.* ¶ 124.
[111] *Id.*
[112] *Id.* ¶ 126.
[113] *Id.* ¶ 127.
[114] *Id.* ¶ 128.

into the public and now declared his vote against the company; never does this; speaks volume [sic]."[115]

On April 16, 2018, USG's Board met to discuss the "new reality."[116] At the meeting, representatives of the Board's legal counsel reviewed the Board's legal obligations and provided an update on the possible outcome of a vote against USG's director nominees.[117] On the same day, Knauf publicly responded to the rejection of its § 220 demand and threatened litigation.[118]

On April 17, 2018, Knauf filed materials with the Securities and Exchange Commission ("SEC") including a presentation touting Berkshire Hathaway's support for Knauf's $42.00 per share offer.[119] Knauf issued a press release on the same day similarly emphasizing Berkshire Hathaway's support for the offer and the Withhold Campaign, stating that Berkshire Hathaway "has offered Knauf an option at $42, which Knauf believes validates the value of its offer, and has publicly stated its intention to VOTE AGAINST USG's four director nominees."[120] Knauf similarly publicized Berkshire Hathaway's support in other public filings and

---

[115] *Id.* ¶ 130.
[116] *Id.* ¶ 137.
[117] *Id.*
[118] *Id.* ¶ 138.
[119] *Id.* ¶ 139.
[120] *Id.* ¶ 140 (capitalization in original).

statements, with one opining: "[r]arely does Berkshire Hathaway take such public positions."[121]

On April 20, 2018, Knauf and USG both filed their respective proxy materials in connection with the Withhold Campaign.[122] Around this date, both Knauf and Berkshire Hathaway spoke separately with Institutional Shareholder Services ("ISS").[123] On April 24, 2018, Knauf met with Shapiro Capital ("Shapiro"), USG's fifth-largest stockholder—Shapiro stated that they would publicly announce their intention to vote against the Board.[124] On the same day, Morgan Stanley circulated to Knauf an analysis of voting scenarios that estimated 57% of withholds in the "base case" of just Knauf and Berkshire Hathaway voting against out of the large proxy institutions and proxy advisors, 65% withholds if ISS endorsed the Withhold Campaign but without the support of the other large stockholders, and 74% with support of the proxy advisors and largest institutions other than Vanguard and Harris.[125]

USG's Board met on April 25, 2018.[126] During the meeting, Scanlon informed the Board that both Berkshire Hathaway and Shapiro had publicly indicated their support for the Withhold Campaign, and that with 45% of USG's

---

[121] *Id.* ¶¶ 140, 144.
[122] *Id.* ¶ 142.
[123] *Id.* ¶ 143.
[124] *Id.* ¶ 145.
[125] *Id.* ¶ 146.
[126] *Id.* ¶ 147.

24

stockholders already indicating they would vote against the director nominees it was likely that USG's director nominees would not receive a majority of the votes cast at USG's 2018 annual meeting.[127] The Board considered providing its view of value to either Knauf or publicly, but "deferred doing so at that time and until other potential acquirers were ruled out."[128] USG issued a press release the same day announcing its first quarter 2018 results and filed its quarterly report in connection with the same—USG disclosed a 4% increase on an adjusted basis in net sales year-over-year.[129] Scanlon was quoted as saying that the quarter "reinforces our confidence in our strategy" and that USG had "the opportunity and available capital to focus on growth and shareholder value creation with a balance sheet that supports our plan."[130] The following day, Knauf issued a press release reaffirming its proposal to acquire USG at $42.00 per share and promoting the Withhold Campaign.[131]

On April 26, 2018, the Board filed a letter and presentation to all of USG's stockholders; the presentation was entitled "USG Maximizing Value for **All** Shareholders."[132] The presentation described Knauf's offer as "significantly undervalu[ing] USG" and that it did not "adequately compensate[] ALL

---

[127] *Id.*
[128] *Id.*
[129] *Id.* ¶ 148.
[130] *Id.*
[131] *Id.* ¶ 149.
[132] *Id.* ¶ 150 (bold in original).

shareholders."[133]  The presentation also stated that the Board rejected the bid "based on USG's intrinsic value."[134]  The letter reiterated many of the same themes, and remarked that the Withhold Campaign was designed "to undermine YOUR Board's ability to negotiate to maximize value for ALL stockholders" and that Knauf was "trying to get you to pressure the USG Board into accepting its opportunistic proposal."[135]  The Board continued: "YOU OWN the industry's CROWN JEWEL and its does not make sense to sell below intrinsic value."[136]

The Board began receiving interest from other potential buyers in April 2018.[137]  The Amended Complaint states that USG interfaced with a "Company A" regarding Company A's potential interest in making a proposal for USG, but Company A later communicated that it was unable to pursue a transaction with USG at that time.[138]  Companies "C" and "D" indicated potential interest in a strategic transaction with USG but were not in a position to do so at that time.[139]  While it was awaiting Company's A's response, the Board reviewed the pros and cons of engaging with Knauf or waiting until USG received further information regarding

---

[133] *Id*. (capitalization in original).
[134] *Id*.
[135] *Id*. ¶ 151 (capitalization in original).
[136] *Id*. (capitalization in original).
[137] *Id*. ¶ 152.
[138] *Id*.
[139] *Id*.

Company A's interest, but ultimately declined to make a decision and decided to "discuss further actions at a later date."[140]

*F. Knauf Prevails in its Withhold Campaign; Knauf and USG Agree to the Acquisition*

USG's Board meet on April 30, 2018, and Scanlon informed the Board that the last of the few potential competing bidders with whom the Board had attempted to engage was unwilling or unable to pursue a transaction at that time.[141] Scanlon also notified the Board that proxy voting advisory services ISS and Glass Lewis had publicly announced their support for the Withhold Campaign, and that the Board was "facing the likelihood of a majority vote against its four director nominees."[142] At the same meeting, the Board authorized Scanlon to begin negotiations within a unanimously-agreed range of $48.00 to $51.00 per share.[143] This range was informed by the Board's view of USG's intrinsic value, and the Board held a detailed discussion with input from its financial advisor to this end.[144] USG's management specifically recommended against the Board publicly stating its views on USG's intrinsic value, and the Board determined not to make such a statement; the Board

---

[140] *Id.*
[141] *Id.* ¶ 154.
[142] *Id.*
[143] *Id.* ¶ 155.
[144] *Id.*

27

concluded that Knauf's $42.00 per share offer did not reflect USG's intrinsic value.[145]

Knauf and USG met later that day and Knauf stated its "desire to have assurances regarding the final price that the Board would accept before making a further offer" and remarked on the likelihood that the Board would want a resolution before the upcoming 2018 annual meeting to avoid a vote against USG's four director nominees.[146]  On May 1, 2018, USG issued a press release announcing the Board's authorization for USG to begin negotiations with Knauf; Scanlon called Buffett that same day to discuss the public announcement of the commencement of negotiations with Knauf.[147]

USG's Board held a meeting on May 3, 2018 where it again considered issuing a public statement on USG's intrinsic value but did not do so.[148]  The Board also discussed the length of a standstill with Knauf, which was then being negotiated; Knauf sought a 30-day standstill at most while USG proposed a 12-month standstill, and the parties eventually entered into a confidentiality agreement with a four-month standstill period.[149]

---

[145] *Id.*
[146] *Id.* ¶ 156.
[147] *Id.*
[148] *Id.* ¶ 158.
[149] *Id.*

On May 7, 2018, two days before USG's annual meeting, Buffett was interviewed on CNBC and stated that this may have been the first time in 53 years that Buffett and Berkshire Hathaway had voted against a slate of directors; Buffett remarked: "we felt that they – they did not represent our interest, and we said that we intended to vote against them at the annual meeting . . . . [W]e just think that directors are there to represent shareholders. And we do not feel that they were certainly representing us with a 30% interest."[150]

On May 8, 2018, USG met with Knauf and communicated a counterproposal of $50.00 per share.[151]

USG's 2018 annual meeting was held on May 9, 2018.[152] At the meeting approximately 75% of shares voted were cast *against* each of USG's director nominees.[153] As a result, Defendants Armario, Haggerty, and Hernandez were not duly re-elected and only continued to serve as holdover directors; Dana Cho was not elected to the Board and the Board voted to reduce its size.[154] The Board met later that day, and Scanlon discussed the defeat as well as the decision to propose $50 per share as USG's counterproposal to Knauf, which Scanlon said was based on DCF

---

[150] *Id.* ¶ 159.
[151] *Id.* ¶ 160.
[152] *Id.* ¶ 161.
[153] *Id.*
[154] *Id.*

valuations performed by the Board's financial advisors and was within the authority approved by the Board.[155]

On May 22, 2018, Knauf rejected USG's $50.00 per share counteroffer and indicated that it was willing to increase its offer to $43.50 per share.[156] During a meeting the next day, Knauf informed Scanlon and Leer that if "Knauf and USG [were] not able to reach agreement, Knauf did not intend to stop pursuing an acquisition of USG."[157] In response, Scanlon and Leer reiterated to Knauf "that the Board believes the intrinsic value of [USG] is $50 a share and that conversations with shareholders led [the Board] to believe that stockholder expectations were closer to the Board's view of value."[158] Nevertheless, Scanlon and Leer indicated that they believed the Board may be willing to support a sale as low as $47.00 per share.[159]

USG's Board met on May 24, 2018 to discuss the ongoing negotiations.[160] The Board was told that Knauf was not assuming any value from synergies, not engaging with the Board's bankers in a typical fashion, and that Knauf did not consider the $47.00 per share suggested by Scanlon and Leer to be a formal

---

[155] Id. ¶ 162.
[156] Id. ¶ 164.
[157] Id.
[158] Id.
[159] Id.
[160] Id. ¶ 165.

counteroffer.[161]  The Board noted its concerns and the risk that Knauf would walk away from negotiations and engage in a hostile acquisition of USG at or below $42.00 per share or pursue an alternative transaction with one of USG's domestic competitors.[162]  Scanlon recounted to the Board Mr. Knauf's assertion that "Knauf did not intend to stop pursuing an acquisition of USG."[163]  Scanlon informed the Board that she intended to "reiterate the Board's view of intrinsic value" in upcoming negotiations with Knauf and intended to "ground th[ose] conversation[s] in the Board's view of intrinsic value."[164]  The Board acknowledged that $47 was a "walk away price for Knauf" and contemplated the likely next steps by Knauf and Berkshire Hathaway in the event the parties were unable to agree on a transaction.[165]  Leer polled each of the directors as to what they believed USG's walk away price should be, though those views are not recorded in the Board's minutes.[166]  After discussion, the Board approved the negotiation of a transaction as low as $44.00 per share.[167]

Throughout May 2018, USG and Knauf continued to engage in negotiations.[168]  During this time the Board authorized outreach to Company A and

---

[161] *Id.*
[162] *Id.*
[163] *Id.*
[164] *Id.* ¶ 166.
[165] *Id.*
[166] *Id.* ¶ 167.
[167] *Id.*
[168] *Id.* ¶ 168.

four other potential bidders, but each potential bidder indicated that they were unable or unwilling to submit a competing bid for USG at that time.[169]

On May 29, 2018, Knauf reaffirmed its $43.50 per share proposal and prepared internally to present USG's Board with a "best and final" ultimatum of $44.00 per share.[170] Knauf recognized internally that USG's Board was unwilling to go below $45.00 per share and Knauf's advisors noted that Knauf's representatives should "avoid making direct threats."[171]

On June 5, 2018, Knauf delivered to USG a "best and final" offer of $44.00 per share, consisting of $43.50 per share in cash at closing plus $0.50 per share in a conditional special dividend that USG would be permitted to pay upon obtaining stockholder approval of adoption of the Merger Agreement.[172]

USG's Board met and discussed Knauf's revised offer on June 6, 2018.[173] The Board determined that it was willing to accept this offer, and in coming to the decision specifically "discussed whether [absent a deal] Knauf would be obligated to vote for [USG's] director nominees at the next annual meeting[.]"[174] The Board also discussed Knauf's "perseverance" and Knauf's representation that it expected

---

[169] *Id.*
[170] *Id.* ¶ 169.
[171] *Id.*
[172] *Id.* ¶ 170.
[173] *Id.* ¶ 171.
[174] *Id.*

32

the support of Berkshire Hathaway.[175]  The next day, Scanlon and USG's General Counsel spoke with Buffett on a confidential basis to inform him that Knauf wanted Berkshire Hathaway to sign a voting agreement supporting a transaction with USG (the "Voting Agreement").[176]  Buffett informed Scanlon that he supported the deal, and Knauf communicated that it was "very important that Berkshire continue to demonstrate its support for the transaction."[177]

On June 10, 2018, USG's Board unanimously approved the Merger Agreement at $44.00 per share and the parties executed the Merger Agreement on the same day.[178]  Berkshire Hathaway executed the Voting Agreement, pursuant to which Berkshire Hathaway agreed to vote all of its beneficially owned shares in favor of the adoption of the Merger Agreement and the approval of the Acquisition, and agreed to vote all of its shares then owned against any acquisition proposal, whether or not it was a superior proposal.[179]

On June 11, 2018, USG and Knauf issued a joint press release announcing the execution of the Merger Agreement.[180]  On that same day, Knauf and Berkshire

---

[175] *Id.*
[176] *Id.* ¶ 172.
[177] *Id.*
[178] *Id.* ¶ 174.
[179] *Id.*  Berkshire Hathaway also agreed "to vote (or cause to be voted) all of its shares then owned against . . . any action or omission that would result in a breach of any representation, warranty, covenant, agreement or other obligation of Berkshire Hathaway under the Voting Agreement[.]" *Id.*
[180] *Id.* ¶ 175.

Hathaway amended their respective Form SC 13D/As to disclose the execution of the Voting Agreement and Knauf's concomitant shared voting power with respect to Berkshire Hathaway's USG stock.[181] On August 23, 2018, the Board authorized USG's filing of a proxy statement in connection with the Acquisition (the "Proxy Statement").[182] USG's stockholders voted on and approved the Merger Agreement on September 26, 2018, and the Acquisition closed on April 24, 2019.[183]

*G. Procedural History*

The original complaint in this Action was filed on August 13, 2018. After two substantially similar putative class actions challenging the Acquisition were consolidated, I heard oral argument on the Plaintiffs' motion for preliminary injunction seeking to enjoin the Acquisition on the basis that the Plaintiffs were likely to succeed in showing that the Acquisition violated 8 *Del. C.* § 203 and that the Proxy Statement failed to make material disclosures.[184] I denied the Plaintiffs' motion for a preliminary injunction on September 25, 2018, finding that the Proxy Statement provided an adequate description of Berkshire Hathaway's role in the Acquisition, and that 8 *Del. C.* § 203 was not implicated because Berkshire Hathaway and Knauf never entered a meeting of the minds that would allow Knauf

---

[181] *Id.* ¶ 176.
[182] *Id.* ¶ 179.
[183] *Id.* ¶ 180.
[184] Pls.' Opening Br. in Support of Mot. for Prelim. Inj., D.I. 51, at 62–69; *see* Pls.' Reply Br. in Further Support of Mot. for Prelim. Inj., D.I. 65.

to control Berkshire Hathaway's shares.[185]  As noted, *supra*, the Acquisition closed on April 24, 2019.

The Plaintiffs filed the Amended Complaint on November 26, 2019.  The Amended Complaint pleads one count: breach of fiduciary duty against each of USG's directors at the time of the Acquisition.[186]  The Amended Complaint alleges that USG's stockholders "did not receive the highest available value for their equity interest in USG," and "suffered the injury of an uninformed stockholder vote"; the Plaintiffs seeks damages including by way of quasi-appraisal.[187]

The Defendants moved to dismiss this Action on February 5, 2020.  I heard Oral Argument on the Defendants' Motion on June 22, 2020, and considered the matter submitted for decision on that date.

## II. ANALYSIS

The Defendants have moved to dismiss this Action pursuant to Chancery Court Rule 12(b)(6).[188]  The standard of review for a Rule 12(b)(6) motion is well settled:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences

---

[185] Telephonic Ruling of the Court Re Pls.' Mot. for Prelim. Inj. Relief, D.I. 71.  I specifically found that "[t]he record demonstrates that Berkshire Hathaway retained control of its stock to pursue its interest, regardless of whether that interest diverged from that of Knauf." *Id*. at 12:17–12:20.

[186] Am. Compl., ¶¶ 207–11.

[187] *Id*. ¶ 211.

[188] Ch. Ct. R. 12(b)(6).

in favor of the nonmoving party; and (iv) dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[189]

When reviewing a motion to dismiss, the Court may take into consideration documents incorporated into the pleadings by reference and judicially noticeable facts available in public SEC filings.[190]

The Amended Complaint pleads a single claim for breach of fiduciary duty against each of the nine members of USG's Board regarding their approval of the Acquisition. The Plaintiffs allege that USG's Board failed to obtain the "highest value available for USG in the marketplace," in a process that, per the Plaintiffs, was infected by both a conflicted controlling stockholder (Knauf) and approved in bad faith by an interested (and/or non-independent) Board. In moving to dismiss, the Defendants contend that the Plaintiffs' claims are subject to business judgment rule review under the rationale of *Corwin v. KKR Financial Holdings LLC*.[191] The Defendants argue that Knauf was not USG's controller, and that *Corwin*'s cleansing effect bars me from engaging in a substantive review of the Acquisition.[192]

---

[189] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002) (footnotes and internal quotation marks omitted).

[190] *Reith v. Lichtenstein*, 2019 WL 2714065, at *1 (Del. Ch. June 28, 2019). I take judicial notice of the Proxy Statement filed with the SEC in connection with the Acquisition, which is attached as Exhibit B to the Defendants' Opening Brief in support of their Motion to Dismiss, and quoted throughout the Amended Complaint.

[191] 125 A.3d 304 (Del. 2015).

[192] *Singh v. Attenborough*, 137 A.3d 151, 151–52 (Del. 2016) ("When the business judgment rule standard of review is invoked because of a vote, dismissal is typically the result. That is because the vestigial waste exception has long had little real-world relevance, because it has been

36

Because the Plaintiffs allege that Knauf was a conflicted controlling stockholder of USG, I first must determine whether the Plaintiffs have sufficiently pled that Knauf was a conflicted controller before reaching the Defendants' *Corwin* defense.[193] After review, I find that it is not reasonably conceivable that Knauf was USG's controlling stockholder, and it is consequently not reasonably conceivable that the Plaintiffs' claims are subject to entire fairness on that ground.

I next determine that though USG's stockholder vote *could have* cleansed the Acquisition under *Corwin*, it did not do so because a rational inference exists, based on the facts pled, that the vote was not fully informed due to a material omission in the Proxy Statement.[194]

But that the Acquisition is not cleansed under *Corwin* does not end my inquiry at this motion to dismiss stage. In light of USG's charter's 8 *Del. C.* § 102(b)(7) exculpatory clause, to survive the Motion to Dismiss the Plaintiffs must plead facts making it reasonably conceivable that the Defendant directors breached their duty

---

understood that stockholders would be unlikely to approve a transaction that is wasteful." (footnotes omitted)); *see e.g. In re Merge Healthcare Inc. S'holders Litig.*, 2017 WL 395981, at *13 (Del. Ch. Jan. 30, 2017); *In re Solera Holdings, Inc. S'holder Litig.*, 2017 WL 57839, at *13 (Del. Ch. Jan. 5, 2017).

[193] *See In re Rouse Props., Inc. Fiduciary Litig.*, 2018 WL 1226015, at *11 (Del. Ch. Mar. 9, 2018) (noting that the *Corwin* analysis "must be deferred" until the allegation that the defendant was a conflicted controller is addressed); *Larkin v. Shah*, 2016 WL 4485447, at *8 (Del. Ch. Aug. 25, 2016).

[194] *See Corwin*, 125 A.3d at 309; *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018).

of loyalty or acted in bad faith.[195]  Because I find that the Plaintiffs have not adequately pled such facts, this Action must be dismissed.

### A. Knauf Was Not USG's Controlling Stockholder

In *Corwin*, the Delaware Supreme Court held that "when a transaction not subject to the entire fairness standard is approved by a fully informed, uncoerced vote of the disinterested stockholders, the business judgment rule applies."[196]  In *Larkin v. Shah*,[197] Vice Chancellor Slight clarified that "a transaction not subject to the entire fairness standard," as used in *Corwin*, should not be read "rigorously literal[ly]"—that is *Corwin* should not be read to hold that all transactions subject to entire fairness for *any* reason are not subject to *Corwin* cleansing—and is instead meant only to refer to certain entire fairness transactions involving a *controlling stockholder*.[198]  Moreover, "the mere presence of a controller does not trigger entire fairness *per se*.  Rather, coercion is assumed, and entire fairness invoked, when the controller engages in a conflicted transaction, which occurs when a controller sits on both sides of the transaction, or is on only one side but 'competes with the common

---

[195] *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1179 (Del. 2015).

[196] *Corwin*, 125 A.3d at 309.

[197] 2016 WL 4485447 (Del. Ch. Aug. 25, 2016).

[198] *Id*. at *1 (Del. Ch. Aug. 25, 2016) ("In the absence of a controlling stockholder that extracted personal benefits, the effect of disinterested stockholder approval of the merger is review[ed]" under business judgment, "even if the transaction might otherwise have been subject to the entire fairness standard due to conflicts faced by individual directors.").

stockholders for consideration.'"[199]  Where a controller exists, it is thus only those instances where the controller has engaged in a conflicted transaction that *Corwin* necessarily has no application.[200]  *Corwin* cannot cleanse such an "inherently coercive" transaction because of the concern that "fear of controller retribution in the face of a thwarted transaction may overbear a determination of best corporate interest by the unaffiliated majority."[201]

The Plaintiffs contend that Knauf was a conflicted controller of USG.  Knauf undoubtedly sat on both sides of the Acquisition, as both the purchaser and a blockholder of USG stock.  Consequently, *Corwin* is inapplicable if the Plaintiffs have adequately alleged Knauf's controller status.

A stockholder can be found to be a controller under Delaware law where they "(1) own[] more than 50% of the voting power of a corporation or (2) own[] less than 50% of the voting power of the corporation but exercise[] control over the business affairs of the corporation."[202]  The Plaintiffs plead that Knauf beneficially owned only 10.6% of USG's common stock outstanding at the time the Merger

---

[199] *In re Merge Healthcare Inc. S'holders Litig.*, 2017 WL 395981, at *6 (Del. Ch. Jan. 30, 2017) (citing *Larkin*, 2016 WL 4485447, at *8; *Kahn v. M &F Worldwide Corp.*, 88 A.3d 635, 644 (Del. 2014)).

[200] *Larkin*, 2016 WL 4485447, at *15; *Merge*, 2017 WL 395981, at *6; *In re Solera Holdings, Inc. S'holder Litig.*, 2017 WL 57839, at *6 n.28 (Del. Ch. Jan. 5, 2017).

[201] *Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *15 (Del. Ch. May 31, 2017).

[202] *Sheldon v. Pinto Tech. Ventures, L.P.*, 220 A.3d 245, 251 (Del. 2019) (quoting *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014)) (internal quotation marks omitted); *accord In re Rouse Props., Inc. Fiduciary Litig.*, 2018 WL 1226015, at *11 (Del. Ch. Mar. 9, 2018).

Agreement was executed, far below the 50% threshold.[203] Consequently, to plead control, the Plaintiffs must adequately pled that Knauf was a controller under the "actual control" test.[204]

To plead actual control, a plaintiff must allege facts that support a reasonable inference of either "(i) control over the corporation's business and affairs in general or (ii) control over the corporation specifically for purposes of the challenged transaction."[205] Pleading general control requires that a plaintiff allege facts showing that a defendant or a group of defendants "exercised sufficient influence that they, as a practical matter, are no differently situated than if they had majority voting control."[206] The Plaintiffs *do not* attempt to plead that Knauf had general control over USG.

But pleading such ubiquitous control is not required, because even a stockholder who does not exercise actual control over a corporation generally can "exercise actual control over the board of directors during the course of a particular transaction," and consequently "assume fiduciary duties for purposes of that transaction."[207] Thus, a plaintiff can plead control by pleading facts supporting a

---

[203] Am. Compl., ¶ 25.
[204] *Rouse*, 2018 WL 1226015, at *11.
[205] *Voigt v. Metcalf*, 2020 WL 614999, at *11 (Del. Ch. Feb. 10, 2020).
[206] *Id*. (quoting *In re PNB Holding Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006)) (internal quotation marks omitted).
[207] *Basho Techs. Holdco B, LLC v. Georgetown Basho Inv'rs, LLC*, 2018 WL 3326693, at *26 (Del. Ch. July 6, 2018).

40

reasonable inference that the defendant "in fact exercised actual control with regard to the particular transaction that is being challenged."[208]  The challenged transaction here is, of course, Knauf's Acquisition of USG.  Therefore, to invoke entire fairness on the basis of Knauf being USG's controlling stockholder, the Amended Complaint must contain well-pled facts demonstrating Knauf's actual control over USG with regard to the Acquisition.[209]

"It is impossible to identify or foresee all of the possible sources of influence that could contribute to a finding of actual control over a particular decision," but, "[i]nvariably, the facts and circumstances surrounding the particular transaction will loom large."[210]  In determining actual control over a challenged transaction, the court "can consider whether the [alleged controller] insisted on a particular course of action, whether there were indications of resistance or second thoughts from other fiduciaries, and whether the [alleged controller's] efforts to get its way extended beyond ordinary advocacy to encompass aggressive, threatening, disruptive, or punitive behavior."[211]

---

[208] *Voigt*, 2020 WL 614999, at *11 (quoting *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006)) (internal quotation marks omitted).

[209] *Sciabacucchi v. Liberty Broadband Corp.*, 2017 WL 2352152, at *16 (Del. Ch. May 31, 2017) ("To invoke entire fairness, the Complaint must contain well-pled facts 'demonstrating [the stockholder's] actual control with regard to the particular transaction that is being challenged.'" (quoting *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014))).

[210] *Basho*, 2018 WL 3326693, at *26, *28.

[211] *Id*. at *28 (citing *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1114 (Del. 1994); *In re Tesla Motors, Inc. S'holder Litig.*, 2018 WL 1560293, at *15 (Del. Ch. Mar. 28, 2018); *New Jersey Carpenters Pension Fund v. Infogroup, Inc.*, 2011 WL 4825888, at *11 (Del. Ch. Sept. 30, 2011)).

As an initial matter, it is, to my mind, not reasonably conceivable that Knauf exercised actual control over the Board *before* the culmination of the Withhold Campaign. That is, the Plaintiffs' allegations of a hard-fought proxy contest urging USG's stockholders to withhold votes from USG's director nominees makes it not reasonably conceivable that prior to the success of the Withhold Campaign, Knauf had "such formidable voting and managerial power that they, as a practical matter, [were] no differently situated than if they had majority voting control [of USG]."[212] The reason for this is simple: the Board appointed its nominees for election; Knauf fought tooth-and-nail such that those nominees would not be re-elected by a vote of USG's stockholders; had Knauf exercised control over USG's Board, it inferably would have been able to control who the Board's nominees were; and, inferably would not have consented to the appointment of nominees who it would then oppose in a public and bruising campaign.

Knauf did not formally prevail in the Withhold Campaign until USG's 2018 annual meeting on May 9, 2018.[213] But the Plaintiffs have pled that USG's Board acknowledged the "writing on the wall"[214]—that Knauf would be victorious—on

---

[212] *KKR*, 101 A.3d at 992 (quoting *In re PNB Holding Co. S'holders Litig.*, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006)).
[213] Am. Compl., ¶ 161.
[214] This is an apt reference by the Plaintiffs given that it meant that the days of the directors' reign were numbered.

42

April 30, 2018.[215]  Consequently, even drawing all reasonable inferences in favor of the Plaintiffs, as I must, it is not reasonably conceivable that Knauf had actual control over USG's Board with regard to the Acquisition before April 30, 2018.

This leaves the crux of the Plaintiffs' control claim: is it reasonably conceivable that Knauf exercised actual control over USG's Board with regard to the Acquisition between April 30, 2018 and June 10, 2018, the date that the Board unanimously approved the Merger Agreement?

The Plaintiffs' briefing cites to scattershot allegations of the Amended Complaint regarding Knauf and Berkshire Hathaway's relationship, including that Knauf (independently and through its coordination with Berkshire Hathaway) "wielded substantial control" and that Knauf and Berkshire Hathaway had aligned interests that manifested in a coordinated effort to pressure the Board into selling to Knauf.[216]  The Plaintiffs contend that Knauf forced the Board into the Acquisition and the Board succumbed because it was "confronted with the reality that its two largest shareholders were working together to force the [Acquisition]."[217]

---

[215] *Id*. ¶ 154 ("Defendant Scanlon also informed the Board that both ISS and Glass Lewis had publicly announced their support for the [W]ithhold [C]ampaign and that, 'in light of these recommendations, and the fact that Berkshire and Shapiro have publicly stated that they intend to vote against the directors,' the Board was facing the likelihood of a majority vote against its four director nominees.").

[216] Br. in Opp'n to Defs.' Mot. to Dismiss the Verified Am. Class Action Compl., D.I. 95 "(Pls.' Opp'n Br."), at 47.

[217] *Id*. at 47–48.

"Stockholders can collectively form a control group where those shareholders are connected in some legally significant way—e.g. by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal."[218] But while the Plaintiffs' briefing insinuates that Knauf and Berkshire Hathaway formed a control group, the Amended Complaint does not explicitly allege a control group—inferably, the Plaintiffs concede that such a finding is foreclosed by my previous findings that Knauf and Berkshire Hathaway "never entered a meeting of the minds" and that Berkshire Hathaway's interests were "allied with the other unaffiliated stockholders."[219] Regardless, the Amended Complaint offers no contradicting reasonable inferences.

The Plaintiffs have pled facts from which I can reasonably infer that both Knauf and Berkshire sought a sale of USG, but, importantly, the Plaintiffs have pled no facts to permit me to reasonably infer the existence of a control group given the fact that Knauf's and Berkshire Hathaway's interests diverged regarding the most important detail of the Acquisition: the price. The *only* reasonable inference is that Berkshire Hathaway's interests aligned with the *Board*—not Knauf—insofar as the Acquisition price was concerned. Inferably, Knauf (as the buyer) sought to pay as

---

[218] *van der Fluit v. Yates*, 2017 WL 5953514, at *5 (Del. Ch. Nov. 30, 2017) (quoting *Frank v. Elgamal*, 2012 WL 1096090, at *8 (Del. Ch. Mar. 30, 2012)) (internal quotation marks omitted).
[219] Telephonic Ruling of the Court Re Pls.' Mot. for Prelim. Inj. Relief, D.I. 71, at 12:21–13:1, 18:5–18:7.

little as possible, and Berkshire Hathaway (as USG's largest stockholder) sought to obtain as high a price as possible for its USG stock. Berkshire Hathaway allegedly wished an exit, but that only indicates Berkshire Hathaway would have supported an acquisition at the highest price exceeding its minimum return. Indeed, while there are plenty of allegations that the Board (and Knauf) considered Berkshire Hathaway's potential actions after the culmination of the Withhold Campaign, there are meager allegations of coordination between Knauf and Berkshire Hathaway.[220] According to the Amended Complaint it was, in fact, USG's CEO who informed Berkshire Hathaway that Knauf wanted Berkshire Hathaway to sign the Voting Agreement supporting the Acquisition and that "Knauf's counsel would be in touch with Berkshire Hathaway's counsel."[221] That the Plaintiffs have pled that *USG*'s CEO was the one to inform Berkshire Hathaway that Knauf wanted Berkshire

---

[220] *E.g.* Am. Compl., ¶¶ 166 ("In the same breath, though, the Board also acknowledged that $47 was 'a walk away price for Knauf' and worried over 'the likely next steps by Knauf and other shareholders *i.e.*, Berkshire in the event that the parties are unable to reach terms. During this meeting, the Board also specifically considered the fact that, while Knauf was limited to making only one public statement during its standstill period, Berkshire was not so limited, and the Board engaged in a discussion of 'the potential paths for Berkshire to exit USG's stock, with a banker noting that none of them are likely if Berkshire believes a sale of [sic] Knauf is possible.' The Board also received a presentation on alternative ways for Berkshire to exit its investment."), 169 ("On May 29, 2018, Mr. Knauf reaffirmed Knauf's $43.50 per share proposal. Internally, Knauf prepared to present the Board with a 'best and final' ultimatum of $44.00 per share. In so doing, it internally planned to leverage Berkshire's continued support."), 171 ("On June 6, 2018, following discussion, which included a discussion of Knauf's 'perseverance in the current instance' and Mr. Knauf's representation to Defendant Scanlon that Knauf expected the support of Berkshire Hathaway, the Board determined that it was willing to accept this offer—marking a decrease of more than $1 billion in what the Board considered fair value for the Company.").
[221] *Id*. ¶ 172.

Hathaway's support for a sale of USG at $44.00 per share hardly suggests that Knauf and Berkshire Hathaway were in coordination. At most, the Amended Complaint pleads a shared goal of a sale of USG, supported by the Plaintiffs' allegations regarding the Withhold Campaign, but the Plaintiffs "must allege more than mere concurrence of self-interest among certain stockholders to state a claim based on the existence of a control group."[222] Because it is not reasonably conceivable that Knauf and Berkshire Hathaway formed a control group with respect to Knauf's Acquisition of USG at $44.00 per share, to the extent that the Amended Complaint implies that a control group was formed, such implication is not supported by well-pled facts.

Left with the allegation that Knauf—a 10.6% stockholder, mind you—was a controller in its own right, the Amended Complaint fails to plead facts from which I can reasonably infer Knauf's actual control over USG's Board. In *In re Tesla Motors, Inc. Stockholder Litigation*,[223] Vice Chancellor Slights remarked that "the cases where this Court has found that a minority blockholder was, in fact, a controlling stockholder recognize that it is the controller's 'ability to dominate the corporate decision-making process' that is important to the controlling stockholder analysis."[224] Likewise, in *In re Cysive, Inc. Shareholders Litigation*,[225] a post-trial

---

[222] *van der Fluit*, 2017 WL 5953514, at *5 (quoting *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *15 (Del. Ch. Oct. 24, 2014)).
[223] 2020 WL 553902 (Del. Ch. Feb. 4, 2020).
[224] *Id*. at *5 (quoting *Superior Vision Servs., Inc. v. ReliaStar Life Ins. Co.*, 2006 WL 2521426, at *4 (Del. Ch. Aug. 25, 2006)).
[225] 836 A.2d 531 (Del. Ch. 2003).

opinion, a 35% stockholder, who was the company's "visionary founder and a 'hands-on' Chairman and CEO" was found to be a controlling stockholder.[226] The CEO in *Cysive* "had placed two of his close family members in executive positions at the company," giving him influence over "the ordinary managerial operations of the company."[227] Thus, under these circumstances the minority blockholder "possessed, as a practical matter, a combination of stock voting power and managerial authority that enabled him to control the corporation, if he so wished."[228] Notably, the Plaintiffs *do not* plead that Knauf had *any* managerial authority. Moreover, there is no reasonable inference that Knauf's stock voting power alone enabled Knauf to control USG "if [it] so wished."[229]

Recognizing that a 10.6% voting stake leaves a steep uphill climb to plead the Knauf was USG's controlling stockholder, the Plaintiffs note that "[a]ctual control over business affairs may stem from sources extraneous to stock ownership."[230] The Plaintiffs argue that Knauf was a controller because it had the ability to take "retributive action in the wake of rejection by an independent board."[231] The

---

[226] *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 991 (Del. Ch. 2014) (citing *Cysive*, 836 A.2d 531).
[227] *Cysive*, 836 A.2d at 551–52; *see In re Morton's Rest. Grp., Inc. S'holders Litig.*, 74 A.3d 656, 665–66 (Del. Ch. 2013).
[228] *Morton's*, 74 A.3d at 666 (quoting *Cysive*, 836 A.2d at 553) (internal quotation marks and alterations omitted).
[229] *Id.* (quoting *Cysive*, 836 A.2d at 553) (internal quotation marks and alterations omitted).
[230] *In re Zhongpin Inc. S'holders Litig.*, 2014 WL 6735457, at *8 (Del. Ch. Nov. 26, 2014) *rev'd on other grounds*, *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173 (Del. 2015).
[231] *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 441 (Del. Ch. 2002).

retributive action doctrine concerns the "risk that that those who pass upon the propriety of the transaction might perceive that disapproval may result in retaliation by the controlling shareholder."[232] Examples of retaliatory acts by a controlling stockholder include "decid[ing] to stop dividend payments or to effect a subsequent cash out merger at a less favorable price."[233]

The "retributive action" put forth by the Plaintiffs is that Knauf launched the Withhold Campaign.[234] But the Plaintiffs fail to identify what precisely is retributive about the attempt to obtain support from other stockholders in order to influence the course of corporate decision making. Further, even if the Board's defeat in the Withhold Campaign led to the directors acceding to the Acquisition, it was the approximately 75% vote of USG's stockholders that would have caused such a decision by the Board, not Knauf's decision to launch the Withhold Campaign in the first place. With this in mind, the Plaintiffs' retributive action argument must then rely only on the allegation that the simple decision to embark on the Withhold Campaign was a retributive act. But *any* stockholder could have engaged in such a

---

[232] *Cysive*, 836 A.2d at 552 n.31 (quoting *Kahn v. Tremont Corp.*, 694 A.2d 422, 428 (Del. 1997)).
[233] *Pure*, 808 A.2d at 436 n.18 (quoting *Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1116 (Del. 1994)).
[234] Pls.' Opp'n Br., at 49 ("Here, Plaintiffs have adequately alleged that Knauf exercised 'actual control' and secured the sale that it demanded through its ability to take 'retributive action,' that it did as a matter of fact take retributive action against the Board through its Withhold Campaign when its overtures were initially rejected, and that the Board responded by acceding to the [Acquisition].").

48

campaign. For these reasons, it is not reasonably conceivable that the Withhold Campaign was a retributive act evincing Knauf's controller status.

The Plaintiffs have failed to plead facts from which I can reasonably infer that Knauf exercised actual control over USG's Board. Consequently, it is not reasonably conceivable that Knauf was a conflicted controller of USG, nor that the Acquisition is subject to entire fairness review on that basis. Thus, the Acquisition is eligible for *Corwin* cleansing.[235]

*B. The Stockholder Vote Was Not Fully Informed*

Under *Corwin*, the Acquisition will be reviewed under the business judgment rule if it was approved by a "fully informed, uncoerced majority of the disinterested stockholders."[236] 88.07% of USG's votes outstanding approved the adoption of the Merger Agreement.[237] The Amended Complaint does not allege nor do the Plaintiffs argue that a majority of USG's disinterested stockholders did not approve the Acquisition or that such disinterested stockholders were coerced. However, the Plaintiffs *do* plead that the stockholder vote was not fully informed.[238]

---

[235] *Larkin v. Shah*, 2016 WL 4485447, at *15 (Del. Ch. Aug. 25, 2016); *In re Solera Holdings, Inc. S'holder Litig.*, 2017 WL 57839, at *6 n.28 (Del. Ch. Jan. 5, 2017).

[236] *Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304, 306 (Del. 2015).

[237] Opening Br. in Support of Defs.' Mot. to Dismiss the Verified Am. Class Action Compl., D.I. 87 ("Defs.' Opening Br."), Ex. D., at 2. I take judicial notice of USG's Form 8-K, filed with the SEC on September 26, 2018, disclosing the results of the stockholder vote to approve the Merger Agreement.

[238] Am. Compl., ¶ 204.

In analyzing whether USG's stockholder vote was fully informed, I must determine whether USG's disclosures "apprised stockholders of all material information and did not materially mislead them."[239] The operative question is whether the Amended Complaint "supports a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading."[240] This inquiry is "necessarily fact intensive and the Court should deny a motion to dismiss when developing the factual record may be necessary to make a materiality determination as a matter of law."[241]

To show that USG's stockholder vote was uninformed, the Plaintiffs must adequately allege that material facts were not disclosed or that the disclosures made were materially misleading. "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[242] Stated otherwise, materiality turns on whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[243] That disclosures must not be materially misleading means that

---

[239] *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018) (citing *Appel v. Berkman*, 180 A.3d 1055, 1057 (Del. 2018)).

[240] *Id.*

[241] *Chester Cty. Emps.' Ret. Fund v. KCG Holdings, Inc.*, 2019 WL 2564093, at *10 (Del. Ch. June 21, 2019).

[242] *Morrison*, 191 A.3d at 282 (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)).

[243] *Id.* at 283 (quoting *Rosenblatt*, 493 A.2d at 944).

"once [D]efendants traveled down the road of partial disclosure of the history leading up to the [Acquisition] . . . they had an obligation to provide [USG's] stockholders with an accurate, full, and fair characterization of those historic events."[244]

Once the Plaintiffs identify a deficiency in the Proxy Statement the Defendants have the burden to "establish that the alleged deficiency fails as a matter of law in order to secure the cleansing effect of the vote."[245]

The Plaintiffs allege that the Proxy Statement issued by the Board in connection with the stockholder vote did not disclose: (1) the Board's internal valuation of USG on an inherent, standalone basis, and the Board's "internal misgivings" that $44.00 per share did not reflect USG's intrinsic value,[246] (2) information regarding the Board's motive to support the Acquisition,[247] and (3) certain preliminary banker analyses that led the Board to reject Knauf's $42.00 per share offer.[248]

### 1. The Board's View of USG's Intrinsic Value

The Plaintiffs' allegations regarding the Board's view of USG's intrinsic value test the line between omissions and misleading disclosures. That is, the

---

[244] *Id.* (quoting *Arnold v. Soc'y for Sav. Bancorp, Inc.*, 650 A.2d 1270, 1280 (Del. 1994)).
[245] *English v. Narang*, 2019 WL 1300855, at *10 (Del. Ch. Mar. 20, 2019) (quoting *In re Solera Holdings, Inc. S'holder Litig.*, 2017 WL 57839, at *8 (Del. Ch. Jan. 5, 2017)).
[246] Am. Compl., ¶ 205.
[247] *Id.* ¶¶ 84, 165, 171.
[248] *Id.* ¶ 100.

Plaintiffs essentially plead that the Board determined USG had an intrinsic value, that the Board did not disclose this material fact, and that by not disclosing its intrinsic valuation the Board's other disclosures, namely its representations that the Acquisition was favorable to USG's stockholders, were rendered materially misleading.[249]

The Plaintiffs have alleged that the Board believed that USG's intrinsic value was $50.00 per share, and have pled that this fact was not disclosed to USG's stockholders.[250] Among other retorts, the Defendants dispute whether the Board had a "personal and unanimous" opinion of USG's intrinsic value.[251] But the Proxy

---

[249] The Proxy Statement reads: "The Board considered that the transaction value was more favorable to our stockholders than the potential value that would reasonably be expected to result from other alternatives available to the Company, including the continued operation of the Company on a standalone basis and other potential actionable strategic transactions." Defs.' Opening Br., Ex. C ("Proxy Statement"), at 45.

[250] Am. Compl., ¶¶ 164, 193.

[251] For example, the Plaintiffs cite USG's opening counteroffer of $50.00 per share, together with the disclosure that the counteroffer was informed by the Board's view of intrinsic value, as support for their allegation that the Board had a view of USG's intrinsic value. *See* Pls.' Opp'n Br., at 8. The Defendants urge that the USG's negotiating position (*i.e.* USG's counteroffer of $50.00 per share) should not be confused with the Board's opinion of USG's value. *See In re OPENLANE, Inc.*, 2011 WL 4599662, at *15 (Del. Ch. Sept. 30, 2011) ("[A] counteroffer is not necessarily a reliable indicator of a Board's view of the Company's value."); *Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *17 (Del. Ch. Mar. 7, 1991) ("[T]he $120 to $150 million figures were not intended as the board's opinion of the company's value. They were merely an asking price, deliberately set high . . . ."). The Defendants are correct that basic negotiation tactics instruct that a counteroffer is not necessarily representative of value. *OPENLANE*, 2011 WL 4599662, at *15 ("[R]egardless of what a selling party may consider a company's fair value to be, that person will seek the highest price she can receive, even if that price is far above the presumed fair value. Thus, it is not clear from a counteroffer what a seller believes a company's fair value to be."). But, the Plaintiffs cite the counteroffer merely as support of their allegation, which is explicitly pled, that the Board's view of intrinsic value was $50.00; thus, the Defendants' argument in this regard is unpersuasive.

52

Statement frequently cites to the Board's view of USG's intrinsic value.[252]

Therefore, it is not an unreasonable inference that the Board actually had formed a

---

[252] By my count, the Proxy Statement references USG's intrinsic value fifteen times. Proxy Statement, at 3 ("Our focus on *intrinsic value*, not daily share price, is evident in the timing of our proposal."), 35 ("She also informed Mr. Buffett that the Board had determined that the per share price proposed by Knauf did not adequately reflect the Company's *intrinsic value*.") ("Ms. Scanlon stated that the Board would consider any bona fide offer that reflected the Company's *intrinsic value*.") ("On December 20, 2017, the Company provided a written response to Knauf indicating that the Board, in consultation with its financial and legal advisors, had considered Knauf's proposal and had determined that the per share purchase price was wholly inadequate given the Company's *intrinsic value* and therefore it was not in the best interest of the Company's stockholders.") ("Ms. Scanlon explained certain factors the Board considered in determining the Company's *intrinsic value*, as well as how the Board viewed U.S. tax reform.") ("She also noted that Knauf would need to offer a higher value before the Company's senior management would be authorized to share non-public information and that the Board would consider all bona fide proposals that reflected the Company's *intrinsic value*."), 36 ("The Board, members of the Company's senior management and the advisors also discussed certain possible transaction complexities that could arise relating to the Company's UBBP joint venture, the fact that Berkshire Hathaway was positioned differently than the Company's other stockholders and would need to take a substantial discount to market to exit its position in the Company's stock in the absence of a sale of the Company, the supermajority vote required by the Company's stockholders to approve a merger with Knauf and possible actions by Knauf or other stockholders to attempt to acquire the Company for less than its *intrinsic value*.") ("The Board then discussed with the Company's senior management and representatives of Jones Day, Goldman Sachs and J.P. Morgan the possible responses to Knauf's revised proposal and methods to give Knauf additional direction that could cause Knauf to meaningfully improve its proposal to better reflect the Company's *intrinsic value*, including the strategy of rejecting Knauf's offer so that Knauf would further increase its proposal.") ("The Board authorized Ms. Scanlon to send a written response to Knauf rejecting the current $42.00 proposal, while also providing additional information regarding the elements of the Company's business plan that the Board believed supported a higher *intrinsic value* for the Company."), 37 ("Ms. Scanlon again reiterated that the Board would engage around any bona fide proposal that reflects the Company's *intrinsic value*, and offered to have a meeting between the respective financial advisors to discuss the Company's views on value.") ("The Board requested that legal counsel attend any meeting of financial advisors given the competitive concerns and also confirmed that the purpose of the meeting was not to negotiate value, but to provide insights on how the parties were thinking about *intrinsic value*.") ("The Company's advisors again reiterated that Knauf's proposed price was not within a range to support the additional costs and distraction to the Company of engaging in a diligence process with Knauf or the risks to the Company of sharing material non-public information with a strategic competitor, and it did not appear that Knauf would be willing to propose a price per share that would be reflective of the Board's view of the *intrinsic value* of the Company."), 38–39 ("The letter to stockholders indicated that although the Board had not made a decision to sell the Company, it remained open to evaluating any proposal to acquire the Company, as it had done with Knauf's proposals, and that if Knauf, or any

53

view of USG's intrinsic value, supported by the Plaintiffs' pleading that Scanlon told Knauf that "the Board believes that the intrinsic value of [USG] is $50 a share."[253]

The Defendants also contend that if the Board did have an opinion of USG's intrinsic value the Board disclosed this opinion by disclosing (i) that it authorized Scanlon to begin negotiations within a range of $48.00 to $51.00 per share, and (ii) USG's first counterproposal to Knauf of $50.00.[254] The Defendants argue that these disclosures, along with the disclosure that USG attempted to persuade Knauf to increase its offer based on the Board's view of USG's intrinsic value, were sufficient to make the stockholder vote fully informed.[255] But, as the Defendants themselves have successfully argued,[256] negotiating price is not indicative of a view of intrinsic value. More fundamentally, it cannot be seriously disputed that the Proxy Statement did not disclose the Board's view of USG's intrinsic value, because *the Proxy*

---

other viable bidder, made a proposal that reflected the Company's *intrinsic value*, the Board would seek to negotiate an appropriate confidentiality arrangement to allow it to share information with the potential counterparty.") ("The Company also filed a letter to its stockholders, which among other things, outlined its disagreements with Knauf's public statements and reiterated the Board's view that Knauf's proposal did not represent the *intrinsic value* of the Company."), 40 ("The Board also authorized Ms. Scanlon to begin negotiations on value within a range of $48.00 and $51.00 per share and discussed the pros and cons of issuing a public statement regarding the Board's view of *intrinsic value*, but decided not to issue such a statement.") (emphasis added to all).

[253] Am. Compl., ¶ 164.

[254] *See* Proxy Statement, at 40–41.

[255] *See id*. at 41–42.

[256] *See* n.251, *supra*.

*Statement discloses that the Board determined not to disclose its view of intrinsic value.*[257]

Even if the Board had a view of intrinsic value, and even if it did not disclose such a view, the Defendants argue that the Board's undisclosed belief of USG's intrinsic value was not material. To this end, Vice Chancellor Laster noted in *In re Appraisal of Stillwater Mining Co.*[258]: "Whether called fundamental value, true value, intrinsic value, or fair value, the really-real value of something is always an unobservable concept. No valuation methodology provides direct access to it. Fundamental value is like a Platonic form, and the various valuation methodologies only cutouts casting shadows on the wall of the cave."[259] In this vein, the Defendants contend that any belief the Board may have had regarding USG's intrinsic value was amorphous, and that the material fact required to be disclosed, and that was disclosed, was that the Board considered $44.00 a share to provide "attractive value" to USG's stockholders considering financial valuations of the company[260] and "the possibility that, in the absence of a proposed strategic transaction with Knauf, when factoring in the cyclicality of the industry in which [USG] operates, the trading price

---

[257] Proxy Statement, at 40 ("The Board also authorized Ms. Scanlon to begin negotiations on value within a range of $48.00 and $51.00 per share and discussed the pros and cons of issuing a public statement regarding the Board's view of intrinsic value, *but decided not to issue such a statement*." (emphasis added)).

[258] 2019 WL 3943851 (Del. Ch. Aug. 21, 2019).

[259] *Id.* at *51.

[260] On DCF, unaffected market price, recent precedent transactions, and trading multiple bases.

of [USG's] common stock . . . may decrease in relation to its trading price prior to the initial public announcement of Knauf's proposal."[261]

I agree with Vice Chancellor Laster's eloquent explanation that "intrinsic value" or "fair value" are nebulous, even illusory, concepts. Belief in any particular intrinsic value, by any being less than an omniscient god, is necessarily a belief that is subjective in nature.[262] But that is not determinative of the disclosure issue at hand. The Amended Complaint avers that the Defendants had a belief as to the precise intrinsic value of USG, and that their disclosures in the Proxy Statement repeatedly imply that such a belief was formed. They, as directors, had a better opportunity to develop a reliable, if still subjective, belief as to intrinsic value than did USG's unaffiliated stockholders.

The animating question is whether by disclosing that the directors had reached a conclusion as to intrinsic value, and in not disclosing what that conclusion was but nonetheless recommending the Acquisition, is it reasonably conceivable that the Defendants created a proxy that was materially misleading to stockholders. I find that the answer is yes.

USG's stockholders should have been "informed of the value that the [Board] placed on [USG] at a point in the negotiations when it had sufficient financial

---

[261] Proxy Statement, at 45.
[262] *But see* 8 *Del. C.* § 262.

56

information to make a serious offer."[263]  This disclosure requirement ordinarily refers to the value of a price proposal in negotiations.[264]  But here, because the Proxy Statement disclosed that the Board held a view of intrinsic value and frequently referenced such a view during its disclosures about the sales process,[265] USG's stockholders were entitled to know the Board's opinion of USG's intrinsic value, even if it was unachievable due to market forces and Knauf's threats to launch a hostile takeover.

If the Board "believed that one estimate was more accurate or realistic than another, it was free to endorse that estimate and to explain the reason for doing so; but full disclosure, in [my] view, was a prerequisite."[266]  The Amended Complaint supports a rational inference that the Board held a view of USG's intrinsic value that it referred to and relied on throughout the sales process, and that the Board's view of intrinsic value was not disclosed to USG's stockholders.  There is a substantial likelihood that a reasonable stockholder would have considered the Board's oft-mentioned view of intrinsic important in deciding how to vote.[267]  Because this view of intrinsic value was not disclosed, there is a rational inference that material facts

---

[263] *In re Dell Techs. Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *40 (Del. Ch. June 11, 2020) (quoting *In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 795 (Del. Ch. 2011)).

[264] *E.g. id.*; *S. Peru Copper*, 52 A.3d at 795.

[265] *See* n.252, *supra*.

[266] *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del. 1977).

[267] *Morrison v. Berry*, 191 A.3d 268, 283 (Del. 2018).

57

were not disclosed, and consequently, USG's stockholder vote was not fully informed.[268]

Since the stockholder vote was insufficient to impose *Corwin*, I could end my *Corwin* analysis here. However, given the distinct but related issues regarding whether the Board's disclosures were in good faith, I think it is appropriate to discuss the other alleged non-disclosures in the Proxy Statement.

### 2. The Board's Motives

The Plaintiffs also contend that the Proxy Statement misrepresented the Board's motives for approving the Acquisition. The Plaintiffs cite allegations that the Board did not disclose its discussion of Berkshire Hathaway's "previously stated desire for an eventual exit," that Knauf "did not intend to stop pursuing an acquisition of USG," and the Board's concern of whether Knauf "would be obligated to vote for [USG's] director nominees at the next annual meeting."[269]

Regarding Berkshire Hathaway's desires, the Plaintiffs essentially contend that Berkshire Hathaway forced the Board to capitulate to the Acquisition, and the Proxy Statement did not disclose that this was the source of the Board's support for the Acquisition. The Proxy Statement *did* disclose that "[t]he Board considered the

---

[268] To the extent disclosures in the Proxy Statement were rendered materially misleading because the Board's view of USG's intrinsic value was not disclosed, USG's stockholder vote was likewise not fully informed.

[269] Am. Compl., ¶¶ 94, 165, 171.

58

fact that a significant number of the Company's stockholders had urged the Company to engage with Knauf following the public disclosure of Knauf's proposal to acquire the Company for $42.00 per share."[270]  It is not reasonably conceivable that this was not a disclosure of the Board's consideration of stockholder desires for a sale of USG, particularly because the Withhold Campaign was framed by both sides as a referendum on USG's $42.00 per share offer.[271]  USG's director nominees lost by a wide margin, and even "[g]etting a substantial, but less than a majority, withhold vote is still an embarrassment and often induces board actions."[272]  The Amended Complaint also acknowledges that Berkshire Hathaway's support for the Withhold Campaign was widely known.[273]  Thus, it is not reasonably conceivable that the effect of the loss of the Withhold Campaign, *i.e.* overwhelming support of Berkshire Hathaway's desire for a sale at $42.00 per share, was concealed from USG's stockholders via the Proxy Statement.  It is therefore not reasonably

---

[270] Proxy Statement, at 47.

[271] *E.g.* Am. Compl., ¶¶ 140 (A Knauf press release stated: "Additionally, after Knauf initiated its 'Withhold' campaign, Berkshire Hathaway publicly stated its intention to vote against USG's director nominees.  Knauf believes that this is a clear indication that Berkshire Hathaway views $42.00 as a reasonable offer price."), 150 (The Board's investor presentation stated: "If Knauf wants to buy USG, it should meaningfully improve its offer price — a vote FOR USG's Board nominees strengthens our negotiating position with Knauf." (capitalization in original)), 151 ("The Board also stated: 'Knauf . . . has launched a campaign to encourage you to vote against USG's Board nominees.  Knauf is doing this in support of its $42 per share proposal to acquire USG . . . .'").

[272] *Sherwood v. Ngon*, 2011 WL 6355209, at *10 (Del. Ch. Dec. 20, 2011) (quoting Marcel Kahan & Edward Rock, *The Insignificance of Proxy Access*, 97 Va. L. Rev. 1347, 1419 (2011)).

[273] Am. Compl., ¶ 140 ("Berkshire Hathaway, a long-term USG shareholder with an approximately 31% ownership stake . . . has publicly stated its intention to VOTE AGAINST USG's four director nominees." (capitalization in original)).

conceivable that the Proxy Statement did not disclose the effect of Berkshire Hathaway's desire to exit its investment on the Board's decision to approve the Acquisition.

The Plaintiffs also contend that the Proxy Statement only disclosed that a delay in negotiations "could result in Knauf *potentially* . . . commencing a hostile tender offer to acquire [USG] at a lower price," when the Plaintiffs allege that the Board *knew as a certainty* that Knauf would launch a hostile tender offer because Mr. Knauf told Scanlon that "should Knauf and USG not be able to reach agreement, Knauf did not intend to stop pursuing an acquisition of USG."[274] But it is not reasonably conceivable that the Board knew as a certainty that Knauf would launch a hostile tender offer,[275] and, nevertheless, the Amended Complaint "alleges no facts suggesting that the undisclosed information is inconsistent with, or otherwise significantly differs from, the disclosed information."[276] What the Proxy Statement disclosed—that failure to approve the Acquisition could result in Knauf launching a hostile tender offer—does not materially differ from Mr. Knauf's alleged statement made in the midst of tense negotiations. Consequently, it is not reasonably conceivable that there was a material omission in the Proxy Statement with regard to the prospect of a hostile tender offer by Knauf.

---

[274] Proxy Statement, at 45 (emphasis added); Am. Compl., ¶ 165.
[275] There is no allegation that any Board member is a clairvoyant.
[276] *Skeen v. Jo-Ann Stores, Inc.*, 750 A.2d 1170, 1174 (Del. 2000).

Remaining of the Plaintiffs' allegations regarding omissions of the Board's motives is the Board's consideration of whether, absent the transaction, Knauf "would be obligated to vote for [USG's] director nominees at the next annual meeting."[277] But it is unclear what effect the Amended Complaint alleges the Board's consideration of an upcoming stockholder meeting had on its motives to approve the Acquisition, and to the extent it was tied to Knauf's ability to engage in further hostilities, that was disclosed. It is not reasonably conceivable that disclosing whether Knauf would have supported the Board's nominees at the following year's annual meeting would have "been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available," when the Proxy Statement already disclosed the possibility that Knauf would go hostile if the stockholders did not immediately approve the Acquisition.[278] It is clear from the Proxy Statement that in recommending that USG's stockholders approve the Acquisition the Board considered and disclosed the possibility of future hostilities between itself and Knauf.

---

[277] Am. Compl., ¶ 171.
[278] *Morrison v. Berry*, 191 A.3d 268, 283 (Del. 2018) (quoting *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985)).

### 3. Banker Analyses

The final alleged nondisclosure is the banker analyses that informed the Board's decision to reject Knauf's $42.00 per share offer as "wholly inadequate."[279] Specifically, the Plaintiffs contend that these preliminary analyses showed that the $42.00 per share proposal was at the low end of the analyses' DCF valuations, below the average for premium analyses, and did not appear to account for lower corporate tax rates.[280]

But the Board was only required to provide a "fair summary of the substantive work performed by the investment bankers upon whose advice the recommendations of their board as to how to vote on a merger or tender rely."[281] The Proxy Statement *did* provide a fair summary of the preliminary analyses, and regardless the financial analyses underlying the Board's recommendation that USG's stockholders approve the Acquisition[282] were disclosed in a manner that the Plaintiffs do not challenge.

The Plaintiffs attempt to fit the square peg of the facts alleged here into the round hole of *Clements v. Rodgers*,[283] which involved two analyses where the latter was "more pessimistic," and there was a plausible inference "that the [valuations] changed in order to justify a bargaining outcome."[284] Conversely, there is no

---

[279] Am. Compl., ¶¶ 100–02.
[280] *Id*. ¶ 100.
[281] *In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 449 (Del. Ch. 2002).
[282] Proxy Statement, at 36, 50–63.
[283] 790 A.2d 1222 (Del. Ch. 2001).
[284] *Id*. at 1243.

allegation here that the analyses underlying the Acquisition were fudged to support the Board's desired-for outcome, nor any allegation from which I can reasonably infer that differences that could have existed between the preliminary and final analyses were pretense. Consequently, it is not reasonably conceivable that material facts were not disclosed regarding the preliminary banker analyses.

### C. The Plaintiffs Have Not Adequately Pled a Non-Exculpated Claim for Breach of Fiduciary Duty

Because there is a rational inference that USG's stockholder vote was not fully informed, *Corwin* is inapplicable, and the Plaintiffs are entitled to a review of whether they have adequately pled breach of fiduciary duty claims against USG's directors. USG's Restated Certificate of Incorporation (the "Charter") contains an exculpatory provision under 8 *Del. C.* § 102(b)(7) that insulates the Defendants from liability for violations of their duty of care.[285] Consequently, under *In re Cornerstone Therapeutics Inc. Stockholder Litigation*,[286] the Plaintiffs must plead a non-exculpated breach of fiduciary duty claim, that is, one that implicates the Defendants' duty of loyalty.[287] "This 'rule applies regardless of the underlying standard of review for the transaction.'"[288]

---

[285] Defs.' Opening Br., Ex. E., at Article Eleventh. I take judicial notice of USG's Charter.
[286] 115 A.3d 1173 (Del. 2015).
[287] *Id.* at 1179–80.
[288] *Reith v. Lichtenstein*, 2019 WL 2714065, at *18 (Del. Ch. June 28, 2019) (quoting *Cornerstone*, 115 A.3d at 1179).

To plead a non-exculpated claim sufficient to survive this Motion to Dismiss, the Plaintiffs must plead facts "supporting a rational inference that the director[s] harbored self-interest adverse to the stockholders' interests, acted to advance the self-interest of an interested party from whom they could not be presumed to act independently, or acted in bad faith.'"[289] A "plaintiff must [adequately plead] a loyalty breach against each individual director; so-called 'group pleading' will not suffice."[290]

The Plaintiffs allege that the Board breached its duty of loyalty because it lacked independence and was interested in the Acquisition. The Plaintiffs also contend that the Board otherwise acted in bad faith in approving the Acquisition. But, to my mind, it is not reasonably conceivable under the facts pled that the Board breached a non-exculpated duty, and consequently the Plaintiffs' claims must be dismissed.

### 1. It is Not Reasonably Conceivable that the Board Lacked Independence or Was Interested in the Acquisition

Other than by pleading bad faith (which I address, *infra*), a plaintiff can plead a non-exculpated breach of duty by pleading facts from which it is reasonably

---

[289] *Cornerstone*, 115 A.3d at 1179–80.
[290] *Reith*, 2019 WL 2714065, at *18 (quoting *In re Tangoe, Inc. S'holders Litig.*, 2018 WL 6074435, at *12 (Del. Ch. Nov. 20, 2018)).

conceivable that the defendants lacked independence or were interested in the transaction.[291]

"Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[292] "Establishing a lack of independence requires pleading allegations that the directors are beholden to the [interested party] or so under [its] influence that their discretion would be sterilized."[293] The Plaintiffs allege that the Defendant Board members lacked independence from Knauf because of their alleged fear of Knauf.

The Plaintiffs contend that after Knauf succeeded in its Withhold Campaign, the Board abandoned its standalone plan for USG, rushed or abandoned other potential buyers, and acceded to the Acquisition even though it had "misgivings" about the deal.[294] But the Plaintiffs allege no facts from which it can be reasonably inferred that the Board's actions were the result of anything other than the corporate merits of the subject. The Plaintiffs simply argue that the Board's actions "have little rational explanation other than fear of Knauf."[295] But "Delaware law presumes

---

[291] *Morrison v. Berry*, 2019 WL 7369431, at *13 (Del. Ch. Dec. 31, 2019).
[292] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *21 (Del. Ch. Oct. 24, 2014) (quoting *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984)).
[293] *Id*. (quoting *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993)) (internal quotation marks omitted).
[294] Am. Compl., ¶ 8; *see* Pls.' Opp'n Br., at 52.
[295] Pls.' Opp'n Br., at 52.

the independence of corporate directors," and the Plaintiffs must overcome the presumption by alleging facts as to Board's lack of independence.[296] The Plaintiffs' conclusory allegation that no other explanation exists for the Board's actions is insufficient to carry their burden.[297] That the Board chose to approve the Acquisition three months after it had told Knauf that its $42.00 proposal was "wholly inadequate" and that the Board was "highly focused on the intrinsic value of [its] long-term strategic plan and measuring that against [$42.00 per share]"[298] is insufficient to reasonably infer lack of independence because the Plaintiffs offer no reasonable basis from which to conclude that the Board's decision to accept the later $44.00 offer was the result of "extraneous considerations or influences."[299] Again, it is the *Plaintiffs' burden* to plead lack of independence.[300]

Additionally, to my mind it is not clear how "fear" evinces lack of independence when such fear, as alleged, results from a withhold campaign that the Board vigorously contested. The Plaintiffs fail to allege facts that show the Board simply capitulated after its defeat; on the contrary the Proxy Statement reflects

---

[296] *In re KKR Fin. Holdings LLC S'holder Litig.*, 101 A.3d 980, 995 (Del. Ch. 2014).
[297] *Pfeffer v. Redstone*, 965 A.2d 676, 685 (Del. 2009) ("[C]onclusory allegations need not be treated as true, nor should inferences be drawn unless they truly are reasonable." (quoting *Feldman v. Cutaia*, 951 A.2d 727, 731 (Del. 2008))).
[298] Am. Compl., ¶ 112;
[299] *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *21 (Del. Ch. Oct. 24, 2014) (quoting *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984)).
[300] Actions inexplicable as a matter of business judgment, of course, may be relevant to allegations of lack of good faith, a matter addressed, *infra*.

robust negotiations between USG and Knauf in May and June of 2018.[301] The only reasonable inference is that any influence that Knauf had on the Board resulted from quotidian calculations of corporate interest, not a disabling lack on independence. "Fear" of a corporate takeover threat—here fully justified after Knauf's resounding withhold victory—is a nod to reality, not a disabling extraneous influence. For these reasons, it is not reasonably conceivable that the Board lacked independence from Knauf.

The Plaintiffs also attempt to plead a non-exculpated claim by invoking the Defendants' alleged interestedness in the Acquisition. The Plaintiffs plead that *all* Defendants other than Scanlon—that is, all eight of USG's Board members other than USG's CEO (the "Non-Scanlon Defendants")—were interested in the Acquisition because a public ouster by Knauf would have imperiled their other business and career interests, which they were not willing to sacrifice in light of their relatively small financial interest in a higher sale price. If adequately pled, such a claim would survive the Defendants' Motion to Dismiss because "[w]hen entire fairness is invoked at the pleading stage, the plaintiffs will be able to survive a motion to dismiss by interested parties regardless of the presence of an exculpatory

---

[301] *E.g.* Am. Compl., ¶¶ 164 ("Mr. Knauf rejected the Company's $50.00 per share counterproposal and indicated that Knauf was willing to increase its proposed price per share to $43.50 . . . Defendants Scanlon and Leer . . . indicated that they believed that the Board may be willing to support a sale as low as $47.00 per share."), 170 ("On June 5, 2018, Mr. Knauf delivered by email a revised written proposal, together with a markup of the merger agreement, in which he communicated Knauf's 'best and final' offer of $44.00 per share.").

charter provision because their conflicts of interest support a pleading-stage inference of disloyalty."[302] "Interestedness means that the directors 'appear on both sides of a transaction [or] expect to derive any personal benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally.'"[303] That the extraneous "benefit" here is actually the avoidance of a detriment is of no moment to the analysis. The Defendant directors must be considered individually in determining whether they were interested in the Acquisition in breach of their duty of loyalty.[304]

The Amended Complaint details the other business interests and positions of the Non-Scanlon Defendants which the Plaintiffs contend made the Non-Scanlon Defendants interested in the Acquisition. They include director and officer positions at other public companies, and board positions at nonprofit organizations.[305] Though the Defendants must be considered individually, it suffices to say that the Plaintiffs' argument with respect to each of the Non-Scanlon Defendants' interest in the Acquisition (given their various reputational interests) is identical. The Plaintiffs allege that each of the Non-Scanlon Defendants faced an "inherent positional

---

[302] *In re Straight Path Commc'ns Inc. Consol. S'holder Litig.*, 2018 WL 3120804, at \*19 n.244 (Del. Ch. June 25, 2018) (quoting *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1180–81 (Del. 2015)).

[303] *Crimson*, 2014 WL 5449419, at \*21 (quoting *Aronson*, 473 A.2d at 812).

[304] *Cornerstone*, 115 A.3d at 1182 ("[E]ach director has a right to be considered individually when the directors face claims for damages in a suit challenging board action.").

[305] Am. Compl., ¶ 186.

conflict" regarding the Acquisition because they had much to lose from a "potentially career-ending and reputation killing proxy fight loss," little to gain from standing up to Knauf, and the Acquisition afforded them a liquidity event in the sale of their equity interests in USG.[306]

The Plaintiffs' principal argument is that Non-Scanlon Defendants capitulated to Knauf because Knauf had made it known they would not stop pursuing an acquisition of USG, and a proxy fight loss would damage their other business interests, positions in other companies, and memberships on other public boards.[307] Quoting at length a law review article by then-Chief Justice Strine, the Plaintiffs contend that independent directors—such as the Non-Scanlon Defendants—are "highly sensitive to resisting institutional campaigns at any company on whose board they serve for fear that they will be targeted for withhold campaigns at all companies with which they are affiliated."[308]

Regardless of the merits of Chief Justice Strine's argument, it is simply not applicable here. Under the facts alleged, it is not reasonably conceivable that the Non-Scanlon Defendants capitulated to Knauf in selfish defense of their outside reputational interests because *USG's directors had already lost a public fight with*

---

[306] *Id.* ¶¶ 186–91; *see* Pls.' Opp'n Br., at 53.
[307] *See* Am. Compl., ¶ 186.
[308] Pls.' Opp'n Br., at 55 (quoting Leo E. Strine, Jr., *Who Bleeds When the Wolves Bite?: A Flesh-and-Blood Perspective on Hedge Fund Activism and Our Strange Corporate Governance System*, 126 Yale L.J. 1870, 1926 (2017)).

*Knauf*. Withhold votes were first proposed by Professor Grundfest as a referendum on managerial performance, and they "represent an important form of shareholder activism."[309] The Amended Complaint recounts at length the publicity surrounding the Withhold Campaign, including Warren Buffett's public opposition to the Board, and that both ISS and Glass Lewis supported Knauf. Thus, the Board had already lost exactly the type of public fight that the Plaintiffs contend made the Board interested.[310]

In fact, the Plaintiffs plead that in the midst of the Withhold Campaign, Knauf "threat[ened]" that the Board "would surely want resolution [on a deal] prior to the annual meeting of stockholders scheduled for May 9, 2018, to avoid a vote against the Company's four director nominees."[311] That is, Knauf alluded to the Defendants' opportunity to take the path that the Plaintiffs suggest amounts to a breach of the duty of loyalty. But the Board declined this course of action, instead proceeding with negotiations on a more measured timeline, thereby accepting the reputational harm of an institutional campaign defeat in order to continue to pursue the corporate interest.

---

[309] Marcel Kahan & Edward Rock, *The Insignificance of Proxy Access*, 97 Va. L. Rev. 1347, 1358, 1374 (2011).

[310] Pope Clement VII learned in dealing with Henry VIII that excommunication is a tool that loses its edge after it is employed. It is the same with withhold campaigns, I presume.

[311] Am. Compl., ¶ 156 (internal quotation marks omitted).

Likewise, the Plaintiffs ask me to draw the inference that the Non-Scanlon Defendants "for the purpose of protecting their reputations as fiduciaries, breached their fiduciary duties, risking the far greater blackening of their fiduciary reputations."[312] Ironic if true. This sounds like a misplaced motivation, because, I believe it is. Given the circumstances alleged by the Plaintiffs, it is not reasonably conceivable that the Non-Scanlon Defendants capitulated to Knauf to protect their reputations, after the Withhold Campaign's success, when any reputational loss that could come from a public loss to Knauf had already occurred.

The Plaintiffs' remaining allegations regarding the interestedness of the Non-Scanlon Defendants are likewise not reasonably conceivable. The Plaintiffs allege that the Non-Scanlon Defendants did not have enough of a financial interest to push Knauf for a better price but at the same time had enough pecuniary interest in a liquidity event such that they were interested in the Acquisition. But this Court has held that "[w]hen directors or their affiliates own 'material' amounts of common stock, it aligns their interests with other stockholders by giving them a 'motivation to seek the highest price' and the 'personal incentive as stockholders to think about the tradeoff between selling now and the risks of not doing so.'"[313] The Non-Scanlon Defendants' personal financial interest in liquidating their USG stock thus *aligned*

---

[312] *Morrison v. Berry*, 2019 WL 7369431, at *14 (Del. Ch. Dec. 31, 2019).
[313] *Chen v. Howard-Anderson*, 87 A.3d 648, 671 (Del. Ch. 2014) (quoting *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 600 (Del. Ch. 2010)).

71

their interests with stockholders and they did not receive a benefit in that regard other than "a benefit which devolves upon the corporation or all stockholders generally."[314] Given that it is not reasonably conceivable that the Non-Scanlon Defendants were interested in the Acquisition due to their fear of a public loss to Knauf, it is likewise not reasonably conceivable that the personal give of pushing for a higher price (*i.e.* putting their reputations on the line) was not worth the get (in the form of increased consideration).[315] Consequently, it is not reasonably conceivable that the Non-Scanlon Defendants' incentives were akilter, nor that they were interested in the Acquisition. I note that the Amended Complaint is silent with respect to any individual director's need for "fire sale" liquidity, nor does the lengthy resistance to Knauf indicate it is reasonably conceivable.

With regard to Scanlon, the Plaintiffs simply allege that she stood to receive a more than $36 million "golden parachute" in connection with the Acquisition.[316] But I need not address whether Scanlon was interested in the Acquisition; since the Plaintiffs have not pled facts from which it is reasonably conceivable that a majority

---

[314] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984); *accord Chen*, 87 A.3d at 671 ("If the decision is made to sell, '[a] director who is also a shareholder of his corporation is more likely to have interests that are aligned with the other shareholders of that corporation as it is in his best interest, as a shareholder, to negotiate a transaction that will result in the largest return for all shareholders.'" (quoting *Orman v. Cullman*, 794 A.2d 5, 27 n.56 (Del. Ch. 2002))).

[315] Notwithstanding the Plaintiffs' allegation that the Defendants owned relatively little USG stock, Am. Compl., ¶ 188, because there was no further threat of reputational harm, they faced only the upside of increased consideration for their USG stock.

[316] *Id.* ¶ 190.

of the Board was interested in the Acquisition, it is not reasonably conceivable that the Acquisition would be subject to entire fairness due to the interestedness of Scanlon alone.[317] Consequently, there can be no pleading-stage inference of disloyalty in this regard, and the Plaintiffs' allegations of interestedness are insufficient to state a non-exculpated claim for breach of fiduciary duty.

### 2. It is Not Reasonably Conceivable that the Defendants Acted in Bad Faith

Other than pleading lack of independence or interestedness, the Plaintiffs can survive the Defendants' Motion to Dismiss by pleading facts supporting a rational inference that the Defendants acted in bad faith.[318] "A director acts in bad faith where he or she 'intentionally fails to act in the face of a known duty to act, demonstrating a conscious disregard for his or her duties.'"[319] "A demonstration of bad faith requires acts or omissions taken against the interest of [USG], with scienter."[320]

---

[317] *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. Comstock*, 2016 WL 4464156, at *18 (Del. Ch. Aug. 24, 2016) ("If a plaintiff alleging a duty of loyalty breach is unable to plead facts demonstrating that a majority of a board that approved the transaction in dispute was interested and/or lacked independence, the entire fairness standard of review is not applied and the Court respects the business judgment of the board." (quoting *Orman*, 794 A.2d at 23)).

[318] *In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173, 1180 (Del. 2015).

[319] *van der Fluit v. Yates*, 2017 WL 5953514, at *8 (Del. Ch. Nov. 30, 2017) (quoting *In re Answers Corp. S'holder Litig.*, 2012 WL 1253072, at *7 (Del. Ch. Apr. 11, 2012)).

[320] *Morrison v. Berry*, 2019 WL 7369431, at *14 (Del. Ch. Dec. 31, 2019).

### a. Omissions in the Proxy Statement

The Plaintiffs suggest that the material non-disclosure of the Board's view of intrinsic value (and its consequent "misgivings" about the Acquisition) give rise to an inference of bad faith. This non-disclosure, of course, permitted the Plaintiffs to plead around *Corwin*.

In contrast with the required showing to plead around *Corwin*, a pleading of bad faith "requires a pleading of facts with respect to the [maldisclosures] from which I may reasonably infer breach of the duty of loyalty, and not simply adequate pleading of a [maldisclosure]."[321] An adequate pleading of bad faith must plead that the maldisclosure was "intentional and constitute[d] more than an error of judgment or gross negligence."[322] This standard is *entirely distinct* from the required pleading to show an uninformed vote under *Corwin*, which merely requires that the complaint "when fairly read, supports a rational inference that material facts were not disclosed or that the disclosed information was otherwise materially misleading."[323] Nowhere does the standard for pleading a material non-disclosure or materially misleading disclosure under *Corwin* refer to, or incorporate, any inquiry regarding knowledge and purpose of the non-disclosure. The focus is on the stockholder-reader, *not* the

---

[321] *Id*. at *18 (Del. Ch. Dec. 31, 2019) (citing *Nguyen v. Barrett*, 2016 WL 5404095, at *3 (Del. Ch. Sept. 28, 2016)).
[322] *Id*.
[323] *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018).

74

*drafter*. But when analyzing bad faith, the creator is the crux of the analysis, and *the why is the locus of the inquiry*.[324] Consequently, even if allegations of omissions or misleading disclosures are sufficient to preclude business judgment review under *Corwin*, where the same omissions or misleading disclosures are pled as evincing bad faith, the pleading is subject to a finer-toothed comb—that of scienter—which is among our law's most straightened.[325] To plead bad faith based on the non-disclosure of the Board's view of USG's intrinsic value, the Plaintiffs must plead that the Defendant directors intentionally withheld their view of intrinsic value in conscious disregard of their fiduciary duties.[326]

The Plaintiffs' allegations of bad faith omissions intimate that the Board did not disclose its view of USG's intrinsic value so that USG's stockholders would approve a transaction that the Board did not believe offered USG's stockholders fair value. But as noted, *supra*, it is not reasonably conceivable that the Board lacked independence or was interested in the Acquisition, and so there is no reasonable inference that the disclosure deficiency emanated from extraneous influences or

---

[324] *Ironworkers Dist. Council of Philadelphia & Vicinity Ret. & Pension Plan v. Andreotti*, 2015 WL 2270673, at *27 n.257 (Del. Ch. May 8, 2015), *aff'd* 132 A.3d 748 (Del. 2016) (TABLE) (noting the role of motive in determining whether bad faith is adequately pled).

[325] *Mesirov v. Enbridge Energy Co., Inc.*, 2018 WL 4182204, at *13 (Del. Ch. Aug. 29, 2018) ("The scienter pleading requirement is among the most difficult in our law to satisfy." (citing *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 862 (Del. 2015))).

[326] *van der Fluit v. Yates*, 2017 WL 5953514, at *8 (Del. Ch. Nov. 30, 2017).

considerations. The Plaintiffs thus must allege bad faith "in the disclosures themselves."[327]

Of course, the Board's view of intrinsic value—$50.00 as alleged by the Plaintiffs—is not the same as the $44.00 per share deal price. At the same time, the Proxy Statement disclosed that "[t]he Board considered that [$44.00 per share] was more favorable to our stockholders than the potential value that would reasonably be expected to result from other alternatives available to [USG], including the continued operation of the [USG] on a standalone basis and other potential actionable strategic transactions, in light of a number of factors."[328] Thus, as the Board told it, consideration of whether the deal price was favorable was influenced by many considerations, including considerations external to the operations of USG's business. This is unsurprising to any market observer.

Assuming that the Defendant directors believed intrinsic value to be $50.00, in isolation their statement that $44.00 is higher than the "reasonably . . . expected" value of continued operations on a "standalone basis," appears inconsistent. That inconsistency tends to disappear in light of the threat of hostile action should the "standalone" option be pursued; it certainly does not create a reasonable inference of bad faith.

---

[327] *Morrison*, 2019 WL 7369431, at *18.
[328] Proxy Statement, at 45.

Considering the other disclosures in the Proxy Statement, it is not reasonably conceivable that the Proxy Statement "represents the knowingly-crafted deceit or knowing indifference to duty that would show bad faith."[329] The Proxy Statement disclosed that the Board initially approved Scanlon to begin negotiations with USG within a range of $48.00 to $51.00.[330] Thus, it was no secret to USG's stockholders that the Board preferred to sell USG for more than $44.00 per share. Moreover, the Proxy Statement disclosed that the approval of that negotiation range was informed by the Board's view of intrinsic value, and that the Board's view of intrinsic value was itself informed by information gathered from USG's management and bankers.[331] Further, notably, the Board's approval of the negotiating range occurred *after* it was obvious that the Withhold Campaign would succeed. At that point,

[329] *Morrison*, 2019 WL 7369431, at *18.

[330] Proxy Statement, at 40.

[331] *Id.* at 36 ("Representatives of Goldman Sachs reviewed with the Board the key terms in the revised proposal from Knauf. Goldman Sachs also reviewed changes to certain financial analyses since December 2017, noting that since then there had been an increase in the Company's 52-week high stock price, as well as an increase in the median and highest analyst target stock prices. The discussion then turned to a review by Goldman Sachs and J.P. Morgan of their preliminary financial analyses and certain inputs that had changed since December 2017 based on market changes and other factors, including the passage of U.S. tax reform.") ("The Board then discussed with the Company's senior management and representatives of Jones Day, Goldman Sachs and J.P. Morgan the possible responses to Knauf's revised proposal and methods to give Knauf additional direction that could cause Knauf to meaningfully improve its proposal to better reflect the Company's intrinsic value, including the strategy of rejecting Knauf's offer so that Knauf would further increase its proposal.") ("The Board authorized Ms. Scanlon to send a written response to Knauf rejecting the current $42.00 proposal, while also providing additional information regarding the elements of the Company's business plan that the Board believed supported a higher intrinsic value for the Company."), 37 ("Ms. Scanlon again reiterated that the Board would engage around any bona fide proposal that reflects the Company's intrinsic value, and offered to have a meeting between the respective financial advisors to discuss the Company's views on value.").

hostile action absent a negotiated transaction was likely, and the Board's position with respect to negotiations needed to be reasonable to avoid such hostile action. In that context, the only reasonable inference is that the Board's approval of a $48.00 to $51.00 negotiating range represented its view of a realistic transaction price, not an overblown opening gambit that risked driving Knauf away, as such a position could have been catastrophic to a negotiated (rather than hostile) transaction. The fact that the Board disclosed this range in the Proxy Statement belies any bad faith attempt to conceal "intrinsic value"; a stockholder reading the Proxy Statement would be well aware that the directors believed a sale should occur in the $48.00 to $51.00 range, although the Board was unable to achieve such a price.

Moreover, it is not reasonably conceivable that the directors would have demonstrated a conscious indifference to their fiduciary duties by not disclosing their view of intrinsic value, while at the same time disclosing to USG's stockholders *that the Board had chosen not to make that very disclosure*.[332] It is near-inconceivable (and thus not reasonably conceivable) that an independent and disinterested Board acting disloyally would have professed its bad faith to USG's stockholders in the Proxy Statement. While I may infer that the Proxy Statement

---

[332] *Id*. at 40 ("The Board also authorized Ms. Scanlon to begin negotiations on value within a range of $48.00 and $51.00 per share and *discussed the pros and cons of issuing a public statement regarding the Board's view of intrinsic value, but decided not to issue such a statement*." (emphasis added)).

negligently failed to inform USG's stockholders of the Board's view of USG's intrinsic value, in light of the other disclosures made, it is not reasonably conceivable that such non-disclosure rises to the level of conscious disregard of duty.

### b. *Revlon* Claim

Finally, the Plaintiffs argue that the sales process was not reasonable, and that the Defendants failed to comply with duties imposed under *Revlon*.[333] The Plaintiffs maintain that, even if they have not pled a non-exculpated breach of loyalty, they may nonetheless survive this Rule 12(b)(6) Motion to Dismiss if they have pled facts by which I may reasonably infer the Defendant directors have breached their "*Revlon* duties." That is, they assert that a freestanding "*Revlon* claim" for damages has been adequately been pled against the Defendant directors. Describing the duties of directors in way of a control transaction as "*Revlon* duties," to my mind, is something of a misnomer; the fiduciary duties are loyalty and care, in any situation—the specific situation, however, dictates the actions required for fulfilment of those duties. Accordingly, where a board decides to sell the company and thus terminate stockholder ownership, the director's fiduciary duties mandate that they concentrate on securing the best price. Put differently, to comply with *Revlon*, "when a board engages in a change of control transaction, it must not take actions inconsistent with

---

[333] *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173 (Del. 1986).

achieving the highest immediate value reasonably attainable."[334]  There is no dispute that the Acquisition constituted a change of control triggering *Revlon* and that "*Revlon* can provide a contextual inquiry about whether the [] Defendants' choices were 'reasonable under the circumstances as a good faith attempt to secure the highest value reasonably attainable.'"[335]  The Plaintiffs argue that it follows, that if it is reasonably conceivable that the Defendants' actions regarding the Acquisition were less than reasonable, the Motion to Dismiss must be denied.  I disagree.

*Revlon* "duties" should not be confused with the *Revlon* standard of review, applicable principally outside the damages context, under which directors must act reasonably.[336]  The *Revlon* directive that the Defendant directors, having made a decision to sell, must focus on price, does not alter the Plaintiffs' pleading burden here. The Plaintiffs seek only post-closing money damages in this Action.  As our Supreme Court has noted, *Revlon* "[was] not [a] tool[] designed with post-closing money damages claims in mind, the standards [it] articulate[s] do not match the gross negligence standard for director due care liability under *Van Gorkom*, and with the prevalence of exculpatory charter provisions, due care liability [itself] is rarely even

---

[334] *C & J Energy Servs., Inc. v. City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr.,* 107 A.3d 1049, 1067 (Del. 2014) (citing *Revlon*, 506 A.2d at 182).

[335] *Morrison v. Berry*, 2019 WL 7369431, at *15 (Del. Ch. Dec. 31, 2019) (quoting *RBC Capital Mkts., LLC v. Jervis*, 129 A.3d 816, 849 (Del. 2015)).

[336] For instance, a showing that directors have constructed an unreasonable sales process can support pre-merger injunctive relief. *See e.g. In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813 (Del. Ch. 2011).

available."[337]  So it is here; under USG's Charter, the Defendants are exculpated from damages for all but loyalty breaches.

Consequently, although "*Revlon* can provide a contextual inquiry about whether the [] Defendants' choices were reasonable under the circumstances as a good faith attempt to secure the highest value reasonably attainable," the Plaintiffs still bear the burden to plead a non-exculpated claim.[338]  Therefore, an allegation implying that a Defendant failed to satisfy *Revlon* is insufficient on its own to plead a non-exculpated breach of the duty of loyalty,[339] and a sufficient pleading must reasonably imply that the directors' failure to act reasonably to maximize price was tainted by interestedness or bad faith.[340]  "In the context of a sale of corporate control, bad faith is qualitatively different from 'an inadequate or flawed effort' to

---

[337] *Corwin v. KKR Fin. Holdings LLC*, 125 A.3d 304, 312 (Del. 2015) (citing *Smith v. Van Gorkom*, 488 A.2d 858 (Del. 1985)).

[338] *Morrison*, 2019 WL 7369431, at *15 (quoting *RBC*, 129 A.3d at 849) (internal quotation marks omitted).

[339] *See In re Essendant, Inc. S'holder Litig.*, 2019 WL 7290944, at *17 (Del. Ch. Dec. 30, 2019) ("In this regard, I have already determined that Plaintiffs have failed to plead viable breach of fiduciary duty claims against the Essendant Board.  But that determination was in the context of, and informed by, Essendant's Section 102(b)(7) charter provision; in other words, the focus was on whether the Complaint contained well-pled allegations of a loyalty breach.  There remains a possibility that Plaintiffs have well pled a breach of the Essendant Board's *Revlon* duties flowing from the duty of care . . . ." (footnotes omitted)).

[340] *See Morrison*, 2019 WL 7369431, at *15 ("In this context, such a pleading requires the Plaintiff to show that it is reasonably conceivable that the Director Defendants knowingly chose to ignore their duty once a sale process was commenced; to maximize stockholder value."); *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *20 (Del. Ch. Mar. 31, 2017) ("In light of the exculpatory provision, to state an actionable *Revlon* claim, Plaintiff must plead that the Individual Defendants consciously disregarded their duties, 'knowingly and completely failed to undertake their responsibilities,' and 'utterly failed to attempt to obtain the best sale price.'" (quoting *Lyondell Chem. Co. v. Ryan*, 970 A.2d 235, 243–44 (Del. 2009))); *Chester Cty. Emps.' Ret. Fund v. KCG Holdings, Inc.*, 2019 WL 2564093, at *16 (Del. Ch. June 21, 2019).

obtain the highest value reasonably available for a corporation."[341] Moreover, absent sufficient allegation of directors' "improper intent, a plaintiff must point to 'a decision [that] lacked any rationally conceivable basis' associated with maximizing stockholder value to survive a motion to dismiss."[342]

The Plaintiffs set forth copious allegations designed to demonstrate the unreasonableness of the Board's sales process. These include that after Knauf's successful Withhold Campaign, the Board abandoned USG's standalone plan and undertook a sale, that the Board rushed the sale and/or abandoned other bidders, and that the Board ultimately capitulated to a sale to Knauf at only $44.00 when it had repeatedly stated that Knauf's takeover attempts at $42.00 per share undervalued USG, were opportunistic, and did not compensate all stockholders for USG's intrinsic value.

But for the Plaintiffs to adequately plead a non-exculpated breach of duty, they must not only allege that the Board's sales process was unreasonable, they must also allege that the Board's alleged failure to run a *Revlon*-compliant sales process was an "*intentional* failure or a *conscious* disregard of the duty to seek the highest price reasonably available."[343] Importantly, where (as here) there is no adequate pleading of conflicted interests or lack of independence on the part of the directors,

---

[341] *Essendant*, 2019 WL 7290944, at *13 (quoting *Lyondell*, 970 A.2d at 243).
[342] *Id.* (quoting *Chen v. Howard-Anderson*, 87 A.3d 648, 684 (Del. Ch. 2014)).
[343] *Id.* at *14 (citing *Lyondell*, 970 A.2d at 243) (emphasis in original).

82

the scienter requirement compels that "a finding of bad faith should be reserved for situations where 'the nature of [the director's] action[s] can in no way be understood as in the corporate interest.'"[344]

The Plaintiffs overall gripe is that the Board did not insulate itself from the pressures of its two largest stockholders and sold at a price less than 5% above an offer[345] the Board had previously stated "substantially undervalues the Company and is not in the best interest of all of USG's shareholders."[346] But, as an initial matter, the *Revlon* mandate—best price—did not kick in until the Board began negotiating to sell USG,[347] so that an analysis under *Revlon* excludes the Board's rejection of Knauf's first two offers and its resistance to the Withhold Campaign.

Is it nonetheless reasonably conceivable that the Defendants acted in bad faith in agreeing to the Acquisition in the aftermath of the Withhold Campaign? The story painted by the Plaintiffs is that after their defeat, the Defendant directors surrendered to Knauf, simply asking Knauf to "pay a small 'obstinance tax' . . . that allow[ed] the [B]oard to save face and claim it protected shareholders from a heist."[348]

---

[344] *Saba*, 2017 WL 1201108, at *20 (quoting *In re Chelsea Therapeutics Int'l Ltd. S'holders Litig.*, 2016 WL 3044721, at *1 (Del. Ch. May 20, 2016)).
[345] $42.00.
[346] Am. Compl., ¶ 112.
[347] *Lyondell*, 970 A.2d at 242 (Del. 2009). In any event, there is no reasonable inference that these actions were in bad faith—they were intended to resist an offer that the Board, and Plaintiffs here, agree was too low.
[348] Am. Compl., ¶ 157.

However, after review of the allegations in the Amended Complaint I find it not reasonably conceivable that the Defendants intentionally acted outside of the corporate interest, or intentionally disregarded that interest. After the Withhold Campaign's success was a foregone conclusion, the Board authorized negotiations within a range that includes what the Plaintiffs plead was USG's actual value. The Amended Complaint pleads no facts from which I can reasonably infer that the negotiation process was a sham or that the Board was not actually seeking a higher price for USG. The Plaintiffs may contend that the Board negotiated poorly, perhaps unreasonably,[349] but that alone is insufficient to plead bad faith.[350] "[T]here is a vast difference between an inadequate or flawed effort to carry out fiduciary duties and a conscious disregard for those duties."[351]

Given the Board's situation—against the ropes after being trounced by its two largest stockholders in the Withhold Campaign—the Board sought a sale at a price above what Knauf had offered. The Board obtained counsel and advice from financial professionals;[352] sought competing bids;[353] negotiated for a higher price;[354]

---

[349] Because a *Revlon* violation absent bad faith is exculpated from liability, I need not reach, and do not reach, a conclusion as to whether the Defendants' actions were unreasonable.

[350] *See Lyondell*, 970 A.2d at 243 ("[T]here are no legally prescribed steps that directors must follow to satisfy their *Revlon* duties. Thus, the directors' failure to take any specific steps during the sale process could not have demonstrated a conscious disregard of their duties."); *In re Morton's Rest. Grp., Inc. S'holders Litig.*, 74 A.3d 656, 676 n.112 (Del. Ch. 2013).

[351] *Lyondell*, 970 A.2d at 243.

[352] Am. Compl., ¶ 155.

[353] *Id*. ¶ 152.

[354] *Id*. ¶ 164.

and attempted to persuade Knauf that the Board's view of value was correct.[355] These allegations are a far cry from the "extreme set of facts" necessary to support a reasonable inference that USG's Board acted in bad faith in its sale process.[356] Ultimately, the Plaintiffs are unsatisfied with the price that resulted from the Defendants' efforts, but as succinctly explained by Vice Chancellor Slights, "criticizing the price at which a board agrees to sell a company, without more, does not a bad a faith claim make."[357]

The *Revlon* reasonableness standard survives as a pleading standard, in a post-closing action for damages, where a plaintiff alleges liability on the part of a *third party* who has aided and abetted directors' breach of the standard.[358] No such liability is alleged here. In order to avoid dismissal, a pleading from which I can merely infer an unreasonable sales process *is not enough* to overcome an exculpatory clause's protections; to survive, such pleading must reasonably imply breach of a *non-exculpated duty*. Even if (exculpated) directors have failed to conduct a reasonable sales process, a viable damages claim based on that process requires well-pled allegations that implicate the Board's duty of loyalty.[359] Because the allegations

---

[355] *Id.*

[356] *In re Essendant, Inc. S'holder Litig.*, 2019 WL 7290944, at *14 (Del. Ch. Dec. 30, 2019).

[357] *Id.*

[358] *See Kahn v. Stern*, 183 A.3d 715, at *1 n.4 (Del. 2018) (TABLE).

[359] *In re Saba Software, Inc. S'holder Litig.*, 2017 WL 1201108, at *20 (Del. Ch. Mar. 31, 2017) ("In light of the exculpatory provision, to state an actionable *Revlon* claim, Plaintiff must plead that the Individual Defendants consciously disregarded their duties, 'knowingly and completely failed to undertake their responsibilities,' and 'utterly failed to attempt to obtain the best sale

here, together with the reasonable inferences therefrom, do not make it reasonably conceivable that the Board acted in bad faith in the sales process, the Plaintiffs have not stated a "*Revlon*" claim upon which relief may be granted.

## III. CONCLUSION

The Defendants' Motion to Dismiss is GRANTED. The parties should submit a form of order consistent with this Memorandum Opinion.

---

price.'"); *Chester Cty. Emps.' Ret. Fund v. KCG Holdings, Inc.*, 2019 WL 2564093, at *18 (Del. Ch. June 21, 2019) ("The allegations support a pleadings-stage inference that the Director Defendants breached their duty of care by failing to employ a reasonable process that managed [their financial advisor's] influence. Whether the Director Defendants' actions in this regard rose to the level of bad faith or merely state a claim for breach of the duty of care is a close call."); *Morrison v. Berry*, 2019 WL 7369431, at *15 (Del. Ch. Dec. 31, 2019) ("More to the point, the Plaintiff must plead facts from which I may reasonably infer that the Director Defendants were aware of these alternatives, understood that they would maximize value, but nonetheless chose instead to act against the interests of the Company and its stockholders.").